819 A.2d 1074

Lev FUTORYAN

v.

MAYOR AND CITY COUNCIL OF BALTIMORE.

No. 1371, Sept. Term, 2001.

Court of Special Appeals of Maryland.

March 26, 2003.

Harry L. Chase (Chase & Chase on the brief), Baltimore, for appellant.

Sandra R. Gutman, Chief Solicitor (Thurman W. Zollicoffer, Jr., City Solicitor on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., HOLLANDER and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

CHARLES E. MOYLAN, Jr., Judge, retired, specially assigned.

### "Conditional Use" and "Special Exception" Are Synonymous Terms

This case concerns what in Baltimore City zoning law is referred to as a "conditional use," but in the zoning lexicon of the rest of the State is known as a "special exception." *Schultz v. Pritts,* 291 Md. 1, 20–21, 432 A.2d 1319 (1981); *Rockville Fuel and Feed Co. v. Board of Appeals,* 257 Md. 183, 187–88, 262 A.2d 499 (1970); *Eastern Outdoor Advertising Co. v. Baltimore,* 128 Md.App. 494, 525–26, 739 A.2d 854 (1999); *Richmarr v. American PCS,* 117 Md.App. 607, 643 n. 26, 701 A.2d 879 (1997); *Mossburg v. Montgomery County,* 107 Md. App. 1, 7 n. 3, 666 A.2d 1253 (1995); *Cromwell v. Ward,* 102 Md.App. 691, 699 n. 5, 651 A.2d 424 (1995); *Hofmeister v. Frank Realty Co.,* 35 Md.App. 691, 698, 373 A.2d 273 (1977); *Anderson v. Sawyer,* 23 Md.App. 612, 617, 329 A.2d 716 (1974). Although we will in this opinion be using the term "conditional use," some of the case law we cite may use the term "special exception." They mean exactly the same thing.

\* \* \*

The appellant, Lev Futoryan, here appeals from the decision of Judge Carol E. Smith in the Circuit Court for Balti-

more City, which affirmed the action of the Baltimore City Board of Municipal and Zoning Appeals in its denial of Futoryan's application for a conditional use permit.

### The Miracle on Thirty–Fourth Street

The property in question is located at 703–05 W. 34th Street. It is zoned B–3–2. That zone consists, however, exclusively of the subject property itself, with residential zoning surrounding it on all sides. The property consists of a 64′ × 122.5′ lot improved with a one story 48′ × 31′ brick building.

In terms of the surrounding neighborhood, the subject property is at the eastern terminus of the 700 block of West 34th Street in Hampden. It is a block that has in recent years enjoyed statewide celebrity for its spectacular display of Christmas electrification, arcing the street itself and replete with model trains and other colorful displays. This seasonal efflorescence attracts thousands of visitors annually and has, with apologies to Maureen O'Hara, John Payne, and Edmund Gwenn, widely but informally come to be known as the "Miracle on Thirty–Fourth Street."

### A Muddle of Issues

**A. The Formal Issue**

As the appeal has been presented to us, both in appellate briefs and in oral argument, the issue before us is perplexingly, if not hopelessly, muddled. On the surface, we have a case that appears to have begun on March 27, 2000, when Futoryan filed his Permit Application for the conditional use of his property as "an automobile repair garage for under 1–½ ton capacity vehicles, in conjunction with an open off-street parking and motor vehicles sales lot." The filing by Futoryan, moreover, was expressly an application for a conditional use. It was not a protestation that such an application was unnecessary.

Consideration of that application proceeded routinely. On April 7, Futoryan received notice from the Executive Director

of the Board of Zoning Appeals that his "application to use the premises for an automobile repair garage" would be scheduled for a public hearing. As of June 10, there was conspicuously posted on the property a Notice that a public hearing would be held on June 20 on the application "for a permit to use the premises for an automobile repair garage." On June 20, as scheduled, a public hearing was held with respect to the "permit to use premises for an automobile repair garage."

Two witnesses testified in favor of the application and seven witnesses testified against it. Reports were submitted by 1) the Baltimore City Fire Department, 2) the Parking Coordination Section and Transportation Engineering Division of the Department of Public Works, and 3) the Department of Planning. Written protests were received from 1) the Hampden Village Merchants' Association and 2) the Wyman Park Community Association.

On June 29, the Board of Zoning Appeals filed its written opinion and decision, denying the application. The entire hearing before the Board had proceeded on the universal assumptions 1) that a conditional use permit had been applied for and 2) that a conditional use permit was required. The formal decision of the Board was:

In accordance with the above facts and findings, the Board disapproves the application.

Indeed, most of what Futoryan now argues as the basis for this appeal is in the unmistakable procedural context of 1) an application for a conditional use permit, 2) a hearing on that application, and 3) an allegedly erroneous denial by the Board of that application. The primary, if not the exclusive, issue before us, therefore, is the propriety of the Board's consideration of and denial of Futoryan's application for a conditional use. That is something we could readily examine on the assumption that the entire process began with the filing of Futoryan's application on March 27, 2000, and that no earlier history was in any way implicated.

## B. The Shadow Issue

What muddles our perception of what is before us, however, is an incorporeal shadow issue. It is a ghost-like contention that was never formally raised, certainly not before the Board of Appeals, but that nonetheless remains as a spectral presence in the wings that will neither step to center stage nor obligingly go away. Futoryan at times comes close to arguing before us, never more than allusively but yet more palpably than he did before the Board, 1) that he had an earlier conditional use permit; 2) that what he subsequently did with his property did not amount to a "change" within the contemplation of the zoning law; and 3) that he did not, therefore, need the new conditional use permit he applied for on March 27, 2000.

Such a framing of the issue, of course, utterly transforms the character of the question before us on this appeal. The appeal Futoryan actually has taken and the shadow appeal he might have taken are in a sense inconsistent with each other. Paradoxically, he seems to be contending that his application for a conditional use was erroneously denied because it was not needed. There is something that somehow jars one's sense of logic in the assertion, "I should have been granted 'A' because I didn't need 'A'." Such a premise, indeed, might seem to call for the very opposite conclusion.

To be sure, the catalyst for Futoryan's application of March 27, 2000, was that he had been issued a violation notice for allowing the garage to operate without a proper zoning permit. The violation notice indicated that there had been a change in the use of the property necessitating a new permit and that no such new permit had been obtained. If there had been such a change in use, Futoryan, indeed, required a new conditional use permit and was in violation of the zoning code for operating without one. If, on the other hand, there had not been such a change, Futoryan was not in violation of the zoning code and no new permit was required.

For purposes of the present appeal, however, those events, although historically edifying, are beside the point. Wisely or

foolishly, Futoryan did not challenge the violation notice by offering as a defense that no change had occurred. No issue concerning change was joined at that procedural stage of the case. For better or for worse, Futoryan simply proceeded with the new application process as if he accepted the fact that that was the appropriate step to take. Futoryan's immediate preservation problem is that even subsequently he did not raise before the Board these intertwined issues of 1) no change in use; and 2) consequently, no need for a new conditional use permit.

Although those issues were never formally raised, however, there were nonetheless periodic allusions to the historic circumstances suggesting that such issues could have been raised if someone had made the effort. They were, at the very least, part of the clearly audible background noise.

The real-world-problem, as Futoryan understandably sees it, is whether he can continue to repair automobiles at 703–05 W. 34th Street. He is less concerned than we with how artfully he framed that problem before the Board. The literal appellate issue before us, by contrast, is whether the Board of Zoning Appeals was in error in deciding the question before it as it did on June 20, 2000. It matters to us, therefore, what the precise and formal question was that was before the Board for its decision. This is our dilemma: whether to confine our review to the formal issue that was before the Board or to acknowledge and to treat the other issue lurking in the near shadows.

## C. The Issues Before Us

In an effort at least to acknowledge proper appellate discipline without cavalierly ignoring the shadow issue from the real world, we are going to frame two issues for consideration.

1. Had there been a sufficient change in Futoryan's use of the premises to require him to obtain a new conditional use permit?

2. Considering the question in a vacuum as a totally fresh application, was the Board of Zoning Appeals in error in denying Futoryan's request for a conditional use permit?

Although we have serious reservations about whether the threshold issue is properly before us, we will indulge Futoryan and address it. It is because our resolution of the threshold issue does not alter our ultimate decision in this case that we feel less compelled to be demanding about the preservation requirement than might otherwise be the case. Were it otherwise, our decision on preservation might be otherwise.

In considering these contentions, we will try to keep the respective analyses in watertight compartments. We will not, as does Futoryan, wander randomly back and forth between totally distinct questions. Confusingly, Futoryan commingles 1) the discussion of whether there had been a change in the use of the property into 2) the consideration of the merits of the application process. They do not, however, blend into a combined issue.

The question of whether there had been a change in the preexisting use is exclusively a threshold issue. If there had been no change in use, no new application for a conditional use would have been needed and the merits of a superfluous application process would become immaterial. Futoryan's cause, if it were to have been pursued, should have proceeded down completely different procedural avenues.

If, on the other hand, there had, indeed, been a change in the use of the property, then a new application for a conditional use was needed. That application process, from that point on, should have proceeded on its own independent merits just as if there had never been any preexisting conditional use as to the property at all. Once the "change" phenomenon crossed the threshold and triggered the application process, it had totally served its function and should have disappeared from the case.

To the extent, therefore, to which Futoryan argues that there had been no change, that argument will be confined to the threshold issue and should not be inserted into the distinct

issue of the merits of the application process. Admittedly, however, trying to separate elements of analysis once they have been so thoroughly mixed is akin to trying to unscramble eggs.

## The Threshold Question Of a Change in Use

### A. The Early History

On the threshold issue, the pre-March 27, 2000, history of the property and its use, which is immaterial on the merits of the application process, takes on critical significance. Various memoranda and reports of the Zoning Administrator and staff, which were submitted to the Board and are part of the record, traced the zoning use of the property since 1958. In 1958 Atlantic Refining Co. obtained a permit to reconstruct a gasoline service station.

With the passage of the New Comprehensive Zoning Ordinance No. 1051 on April 20, 1971, the subject property was zoned as a B–3–2 Business District. That zoning, however, applied only to the subject property. It was, and still is, completely surrounded by residential zoning. Within the B–3–2 zone, both gasoline service stations and "garages, other than accessory, for storage, repair, and servicing of motor vehicles not over 1–½–tons capacity—including body repair, painting, and engine rebuilding" are listed as conditional uses under § 6–408 of the Baltimore City Zoning Code (2000). Following the comprehensive rezoning of 1971, J. Morrison and F. Carozza obtained a conditional use permit to use the property as "a full-service gasoline station and auto repair shop."

The pertinent modern history of the property and its use begin with its purchase by Futoryan in 1992. On July 23, 1996, Permit No. 61589 was issued to Futoryan "to use premises for full service gas station including auto repair and sales." That conditional use permit replicated Permit No. 417–83X, which had been issued to Morrison and Carozza in 1983. That conditional use of July 23, 1996, is our point of departure for measuring any subsequent change. The appli-

cation for that permit indicated that the property was being "used for a gas station with repairs and sales" and that it would be continued "to be used for same."

## B. The Arguable Change in Use

The change, the significance of which remains to be decided, occurred at some time between late 1998 and the Spring of 1999. Prior to that time, the property had been used by Futoryan himself primarily to sell gasoline both to the public and to taxicabs, with auto repair as a distinctly auxiliary or secondary function. At about that time, Futoryan had the gasoline tanks removed and discontinued the use of the property as a service station.

Shortly after the gas tanks were removed in 1998, Futoryan leased the property to Koljit Gill or National Transportation, whose operations manager, Louis Johnson, testified as to the use of the property after National Transportation took over in April 1999. Johnson said National owned a fleet of taxis and used the property to repair and service the cabs as well as for the public. The facility is open 7 a.m.–11 p.m., 6 days a week. The remodeling of the waiting area and the installation of new lifts and equipment cost well over $100,000. Two bays are in operation.

## C. The Legal Significance of a Change In Use

The issue before the Board, and now before us, is whether the changes to the use of the property in 1998–1999 constituted a "change" within the contemplation of § 3–306(b)(2) of the Baltimore City Zoning Code. Section 3–306(b) provides:

(b) *Lawful preexisting uses reclassified as conditional.*

(1) If an existing lawful use is reclassified by this article as a conditional use in the district in which it is located, the use may be continued as a lawful conditional use subject to the conditions and restrictions previously imposed on it by law or regulation.

(2) *Any change to that use, including any expansion, relocation, or structural alteration, is subject to the*

*procedures and requirements imposed by this article on conditional uses.*

(Emphasis supplied). If there had, indeed, been such a change, Futoryan was then properly required to apply for a new conditional use permit authorizing the changed use of the property, in which case "the Board must begin the notification and deliberation process anew." *Cochrane v. Mayor and City Council of Baltimore,* 147 Md.App. 470, 472–73, 809 A.2d 706 (2002).

## D. The Evidence of Change

■ The question we have agreed to consider is whether the total elimination of what had theretofore been the primary use of the property and the expansion of what had theretofore been a secondary or auxiliary use to fill the resulting void constituted a sufficient change to trigger a new application process.

No less than six protesting neighbors testified to offensive conditions caused by the significant expansion of automobile repairs and body and fender work that had not been earlier posed by a gasoline service station. Mark Dent, who lives approximately 22 feet from the property, stated that the lot is unsecured, that children play in the area of the business, which is strewn with broken glass and cars on jack stands. He also stated that engines, tires, and transmissions are placed on top of barrels containing oil and trash. He added that no one would want to live nearby with the constant noise, filth, and dirt.

Elizabeth Callahan testified that cars brought for servicing are pushed into the bay and often drift into Keswick Road, creating a traffic hazard. She also stated that cabs in various mangled states are left on the sidewalk instead of the lot where they belong. Cabs are also parked "on the sidewalk and in the street there and in their driveway so that there is no access at all anywhere around." She stated that the cabs are repaired on the sidewalk, which means that residents of the area have to walk into the street in order to avoid them.

Marsha Henry stated that cars being cut in half and workmen yelling at each other above the noise awaken neighbors in the middle of the night. Diane Wallace testified that the cabs take up the neighbors' parking spaces and are parked on the sidewalks along with Petitioner's commercial tow truck.

Shirley Montgomery testified that the side of the building and the alley between the building and the residences are always piled with tires and cab doors and other equipment. That condition has existed ever since National leased the premises. Ms. Montgomery explained that, when wrecked cabs are brought in, all of the parts are removed in order to salvage the usable parts. The rest are thrown on the side of the alley. James McDaniel stated that oil, grease, antifreeze, and debris run down the alley into the city drain and are also allowed to accumulate in the alley.

In argument before the Board, Daniel Harvey, representing the protestants, summarized the change and its impact.

What we've got here is a situation where *we started with a neighborhood gasoline station with garages as an accessory use.* There was inflow and outflow of cars on a regular basis, and it caused no problems, but *what you've seen in the past 2 years is a morphing, is a change from a gas station use into a strictly garage and repair use* with commercial vehicles, with repairs taking place inside the bays, outside of the bays, 20 cars on the lot, no room for circulation, and that is why the community has, has now risen to the occasion and said that there are problems with this use that we cannot tolerate.

(Emphasis supplied).

After a member of the Board characterized what Mr. Harvey was describing as "a change in use ... from a neighborhood gas station," Mr. Harvey went on:

[L]et me point out that the last time this property was a subject of an appeal, No. 417–83X (1983), *the proposal was to use the premises as a public, full-service gasoline station with automobile repair shop, no body and fender work and no painting.* I think the pictures show to you that body

work and fender work is taking place, and furthermore, in that decision of the Board, it was agreed that the premises would be landscaped along the frontage of Keswick Road. We can see that that did not take place.

(Emphasis supplied).

### E. The Quality of Change

It is Futoryan's position that if no totally new use is introduced into the mix, no change has occurred. We hold, to the contrary, that a significant alteration of the proportions of two or more elements in a mixture can just as surely constitute a change as can the introduction of a new element. A cup of coffee laced with a tablespoon of brandy is not the same thing as a glass full of brandy, and permission might well be required to switch from the former to the latter.

Even if A and B are both conditionally permitted uses, therefore, it was not, as a matter of law, capricious or arbitrary for the Board to conclude that a switch in a conditional use from a combination of 9 A's and 1 B to a combination of no A's and 10 B's (or perhaps even 12 or 15 B's) was a sufficient change in the character of a use to require a fresh approval process.[1]

### F. The Expertise of the Zoning Authority As to What the Zoning Code Means by "Any Change to that Use"

When it comes to an interpretation by the Board of Zoning Appeals of what § 3–306(b)(2) of the Zoning Code means by the phrase "[a]ny change to that use," it is particularly appropriate to note what Judge Eldridge said in *Board of Physician Quality Assurance v. Banks*, 354 Md. 59, 68–69, 729 A.2d 376 (1999):

---

**1.** Even if, for example, a rose garden and an outhouse are both conditionally permitted uses on a property, may it nonetheless not be said that there has been a change in the character of its use when a property that once embraced nine rose gardens and one outhouse now harbors no rose gardens but ten outhouses? As Nicholai Lenin observed, "At a certain point, a change in quantity becomes a change in quality."

Even with regard to some legal issues, a degree of defer-ence should often be accorded the position of the adminis-trative agency. Thus, *an administrative agency's interpre-tation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts.* ('The interpretation of a statute by those officials charged with administering the statute is ... entitled to weight'). Furthermore, *the expertise of the agency in its own field should be respected.*

(Emphasis supplied).

In *Marzullo v. Kahl,* 366 Md. 158, 173, 783 A.2d 169 (2001), Judge Cathell similarly admonished:

[E]ven though the decision of the Board of Appeals was based on the law, *its expertise should be taken into consid-eration and its decision should be afforded appropriate deference.*

(Emphasis supplied). See also *Angelini v. Harford County,* 144 Md.App. 369, 372–74, 798 A.2d 26 (2002); *Bowman Group v. Moser,* 112 Md.App. 694, 699, 686 A.2d 643 (1996) ("In zoning matters, the zoning agency is considered to be the expert in the assessment of the evidence, not the court.").

Based upon the extensive evidence before it, at the very least creating a fairly debatable issue, the Board, although it was not necessarily called upon to do so, found expressly that there had been a change in the character of the use of the subject property.

In summary, *the Board finds that the operation of the garage has changed since the Board's prior approval* in Appeal 417–83X [1983] and is operating without the approv-al that is required by the Board under (Section 3–306b(2) of the Zoning Code); and that the business/garage has been operating illegally and is not being operated in a profession-al manner.

(Emphasis supplied).

■ The Board, in its expertise, characterized what hap-pened in 1998–1999 as a change in use of the kind necessitat-ing a fresh approval process. That is preeminently a type of

decision within the expertise of the Board. Deferring to that expertise, we affirm the Board's decision that the procedural threshold described by § 3–306(b)(2) was crossed. Accordingly, Futoryan was legally required to submit his property, afresh, to the conditional use application process.

### The Merits of Denying The Conditional Use Application

Once a proper finding of a "change" in use has triggered a new application process, that process may now be reviewed on its merits without the review's being encumbered by any historic baggage. Futoryan's application for a conditional use permit on March 27, 2000, and the hearing on that application by the Board on June 20, 2000, will now be reviewed as if no prior zoning history with respect to that property existed.

### A.   The Potentially Suspect Quality of a Conditional Use

In *Anderson v. Sawyer,* 23 Md.App. 612, 329 A.2d 716 (1974), Judge Davidson for this Court thoroughly set forth both the procedures and the allocation of the burden of proof involved in the application for a conditional use permit. She explained initially how there is a presumption that a statutorily recognized conditional use is "in the interest of the general welfare," but that there may be particular "fact[s] or circumstance[s] negating the presumption." Accordingly, the decision to grant a conditional use is never automatic, but will be delegated to an administrative board to assess, in each particular case, whether the use will adversely affect "the neighboring properties."

> The conditional use or special exception is a part of the comprehensive zoning plan sharing the presumption that, as such, it is in the interest of the general welfare, and therefore, valid. The special exception [or conditional use] is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible *absent any fact or circumstance negating the presumption. The duties given the Board are to judge whether the neighboring properties in the general neighborhood would be*

*adversely affected* and whether the use in the particular case is in harmony with the general purpose and intent of the plan.

23 Md.App. at 617, 329 A.2d 716 (emphasis supplied).

## B. The Allocation of the Burden of Proof As To a Conditional Use

■ It is the applicant, moreover, who bears the burden of persuading the administrative board that the desired use will not adversely affect the neighborhood.

*[T]he applicant has the burden of adducing testimony which will show that his use meets the prescribed standards and requirements .... If he shows to the satisfaction of the Board* that the proposed use would be conducted without real detriment to the neighborhood and would not actually adversely affect the public interest, *he has met his burden.*

23 Md.App. at 617, 329 A.2d 716 (emphasis supplied).

## C. The Deference Due to the Zoning Authority

■ If there is some evidence pointing in each direction, the issue is, by definition, "fairly debatable," and the decision of the administrative agency, whichever way it goes, may not be reversed on judicial review as having been arbitrary or capricious.

*If the evidence makes the question* of harm or disturbance or the question of the disruption of the harmony of the comprehensive plan of zoning *fairly debatable, the matter is one for the Board to decide.*

23 Md.App. at 617, 329 A.2d 716 (emphasis supplied).

When, seven years later, Judge Davidson authored the opinion for the Court of Appeals in *Schultz v. Pritts,* 291 Md. 1, 432 A.2d 1319 (1981), she repeated verbatim, 291 Md. at 11, 432 A.2d 1319, her earlier language from *Anderson v. Sawyer.* After thus putting the seal of approval on the standards articulated in *Anderson v. Sawyer, Schultz v. Pritts,* 291 Md. at 12, 432 A.2d 1319, summed up their collective impact:

These standards dictate that *if a requested special exception use is properly determined to have an adverse effect upon neighboring properties in the general area, it must be denied.*

(Emphasis supplied).

## D. The Difference Between a Permitted Use and a Conditional Use

*Schultz v. Pritts* itself was particularly helpful in clarifying the distinction between a permitted use and a merely conditional use (or special exception). With respect to permitted uses, Judge Davidson explained:

[W]hen the legislative body determines that the beneficial purposes that certain uses serve outweigh their possible adverse effect, such uses are designated as permitted uses and may be developed even though a particular permitted use at the particular location proposed would have an adverse effect above and beyond that ordinarily associated with such uses. For example, churches and schools generally are designated as permitted uses. Such uses may be developed, although at the particular location proposed they may have an adverse effect on a factor such as traffic, because the moral and educational purposes served are deemed to outweigh this particular adverse effect.

291 Md. at 21, 432 A.2d 1319.

A merely conditional use (or special exception), by contrast, is one with respect to which the beneficial purpose, albeit compatible with permitted uses, does not necessarily outweigh the possible adverse effects. It is for this reason that an administrative agency must engage in the process of weighing, on a case by case basis, probable benefit versus probable detriment. *Schultz v. Pritts* further explained:

*When the legislative body determines that* other uses are compatible with the permitted uses in a use district, but that *the beneficial purposes such other uses serve do not outweigh their possible adverse effect, such uses are designated as conditional or special exception uses.* Such uses cannot

be developed if at the particular location proposed they have an adverse effect above and beyond that ordinarily associated with such uses. For example, funeral establishments generally are designated as special exception uses. Such uses may not be developed if at the particular location proposed they have an adverse effect upon a factor such as traffic because the legislative body has determined that *the beneficial purposes that such establishments serve do not necessarily outweigh their possible adverse effects.*

291 Md. at 21–22, 432 A.2d 1319 (emphasis supplied).

In *Cromwell v. Ward,* 102 Md.App. 691, 702, 651 A.2d 424 (1995), Judge Cathell explained for this Court why a proposed conditional use must thus be subjected to the weighing process.

"A conditional use is a desirable use which is *attended with detrimental effects which require that certain conditions be met.*" "A special exception [or conditional use] involves a use which is permitted ... *once certain statutory criteria have been satisfied.*"

(Quoting with approval from *Eberhart v. Indiana Waste Systems, Inc.,* 452 N.E.2d 455, 459 (Ind.App.3d Dist.1983) and *Ash v. Rush County Bd. of Zoning Appeals,* 464 N.E.2d 347, 350 (Ind.App. 1st Dist.1984)) (emphasis supplied). See also *Mossburg v. Montgomery County,* 107 Md.App. 1, 7–8, 666 A.2d 1253 (1995).

### E. The Weighing Process in this Case

■ In this case, the Board of Zoning Appeals engaged in such a weighing process. Extensive evidence was offered to show that the proposed conditional use would have an adverse effect on the neighboring properties. The report of the Department of Planning recommended that the application be disapproved. In support of that recommendation, the report noted:

The applicant has been operating this business without a permit. In March of this year he was issued a zoning violation for same, and for the condition of the site. *The lot*

*is extremely unkempt and overrun with vehicles.* Staff found that *on several occasions there were at least twenty vehicles jammed in on the lot, with no order or room for circulation. The business has been an eyesore and a nuisance to the surrounding community for quite some time,* and surrounding neighbors have expressed opposition to this appeal. The additional congestion and traffic generated by motor vehicle sales and a cab company would worsen the already poor condition of the site.

(Emphasis supplied).

We have already, in discussing the threshold issue of change, quoted from the testimony of six protesting neighbors, who described various offensive and unpleasant conditions. On the earlier issue, of course, what mattered about their testimony was that they described a change. On that issue, whether the change was for the better or for the worse was immaterial; what mattered was the fact of change *per se.* On this issue, by contrast, what matters is that they described detrimental conditions. Whether conditions had deteriorated (to wit, changed) to that state or simply appeared in that state *ab initio* is immaterial. What matters is that the use, whatever its provenance, would result, if approved, in a continuation of detrimental and undesirable conditions.

There were also letters of protest, detailing their objections, from the Wyman Park Community Association, Inc., and from the Hampden Village Merchants Association. After summarizing the evidence that had been submitted before it, the Board made specific findings, as it disapproved Futoryan's application.

*The Board,* in making its decision to disapprove this appeal, *has given due regard to the nature and the condition of the adjacent uses and structures,* the facts presented, reports from City agencies, particularly the Department of Planning and standards for conditional uses under Section 14–204 and 14–205 of the Zoning Code. *The Board,* in reviewing item 4, specifically, the proximity of dwellings under the standards of a conditional use *finds that subject*

*site* (zoned B–3–2) *is an island surrounded by an R–7 Residential District* consisting mainly of attached dwellings. *The Board* after reviewing the testimony and the pictures submitted *finds that the operation of the garage* is being done without the proper permits and *is a detriment to the general welfare of the adjoining residential community.* In considering item 13 under the conditional use standards, matters to be of interest to the general welfare, *the Board finds that the operation (garage) being conducted at the subject site is not in the best interest of the general welfare of the community. ... The existing conditions* in the operation of the garage *are having a detrimental effect* (i.e. oil in gutter, loud music, late hours of operation, no accountable to zoning laws, etc.) *on the general welfare of the adjacent residential community.* Therefore, based on the findings and facts, applicable laws and provisions of the Zoning Code and the reasons expressed herein, the Board denies the request.

(Emphasis supplied).

## F.  The Substantial Evidence Test

There was substantial evidence to support that conclusion of the Board.  In *Eastern Outdoor Advertising v. Mayor and City Council of Baltimore,* 128 Md.App. 494, 514, 739 A.2d 854 (1999), Judge Harrell clearly enunciated the appropriate standard for the appellate review of an administrative decision supported by such substantial evidence.

We have held on numerous occasions that a *court's role* in "reviewing the decision of an administrative agency *is limited to determining if there is substantial evidence in the record* as a whole to support the agency's findings and conclusions. . . ."  When reviewing findings of fact and conclusions regarding mixed questions *the circuit court "cannot substitute its judgment for that of the agency and must accept the agency's conclusions if they are based on substantial evidence* and if reasoning minds could reach the same conclusion based on the record."

As to the quality of "substantial evidence," Judge Harrell had earlier described that quality in *Friends of the Ridge v. Baltimore Gas and Electric Co.*, 120 Md.App. 444, 466, 707 A.2d 866 (1998), vacated in part, 352 Md. 645, 724 A.2d 34 (1999):

> *The substantial evidence standard* applicable to the Board's findings of fact and resolution of mixed questions of law and fact, *sometimes referred to as the "fairly debatable" test*, is implicated by our assessment of whether the record before the Board contained at least "a little more than a scintilla of evidence" to support the Board's scrutinized action. *If such substantial evidence exists*, even if we would not have reached the same conclusions as the Board based on all the evidence, *we must affirm.* Stated another way, *substantial evidence pushes the Board's decision into the unassailable realm of a judgment call, one for which we may not substitute our own exercise of discretion.*

(Emphasis supplied). See also *Bowman Group v. Moser*, 112 Md.App. 694, 699, 686 A.2d 643 (1996); *Colao v. Prince George's County*, 109 Md.App. 431, 458, 675 A.2d 148 (1996).

On the merits, we affirm the decision of the Board of Zoning Appeals as having been based on substantial evidence. More strictly speaking, of course, what we are affirming is the decision of Judge Smith in the Circuit Court for Baltimore City, as she, in turn, affirmed the Board of Zoning Appeals.

## The Partial Irrelevance Of *Schultz v. Pritts*

Futoryan several times mentions, though only in passing, what could be the most academically fascinating aspect of the case. It is an issue that was not raised or argued before the Board of Zoning Appeals. It was neither raised nor argued in Futoryan's appeal to the Circuit Court. Although only referred to *sotto voce* before us, it is an issue that nonetheless demands some comment. Futoryan's brief at one point at least lays out a predicate for what could have become a major argument but was never thereafter further developed.

The appropriate standard to be used in determining whether a conditional use would have an adverse effect and

therefore should be denied is whether there are facts and circumstances that show that the particular use proposed at that particular location would have any adverse effects above and beyond those inherently associated with such a conditional use irrespective of its location within the zone. *Eastern Outdoor, supra. There was no evidence that the repair garage at the Property had adverse effects above and beyond those associated with other repair garages in the zone.*

(Emphasis supplied).

## A. The Impossibility of Comparing Something With Nothing

Of course, there was no such evidence, because, in the unique circumstances of this case, there could not possibly be such evidence. The B–3–2 zone in this case is a tiny island, measuring a mere 64' by 122.5' and completely surrounded by residential zoning. Futoryan's property is the entire zone. The conditional use here cannot, by definition, have a greater adverse impact at this location than it would have at some other location within the zone because there is no such thing as "some other location within the zone." There can be no comparative degree, no greater adverse impact and no lesser adverse impact, when there is nothing with which to compare the location in question. That aspect of the *Schultz v. Pritts* standard can be neither satisfied nor violated. It is simply rendered irrelevant by circumstances that do not permit the anticipated comparison to be made.

That inherent impossibility of satisfying *Schultz v. Pritts's* locational comparison, however, does not, in the unique circumstances of this case, imply that the conditional use in issue must automatically be approved. Although in their articulation the tests are sometimes telescoped together into a single compound test, there are actually two tests inherent in the *Schultz v. Pritts* guidelines.

## B. The Locational Comparison of Adverse Impacts

The more prominent and high profile of the two is that which assumes an adverse impact from the conditional use and

then compares the relative severity of the adverse impact at the location in question with its likely severity at other locations within the zone. Judge Davidson explained this locational comparison.

These cases establish that a special exception use has an adverse effect and must be denied when it is determined from the facts and circumstances that the grant of the requested special exception use would result in an adverse effect upon adjoining and surrounding properties unique and different from the adverse effect that would otherwise result from the development of such a special exception use *located anywhere within the zone.* Thus, these cases establish that the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any *adverse effects above and beyond those inherently associated with such a special exception use irrespective of its location within the zone.*

291 Md. at 15, 432 A.2d 1319 (emphasis supplied). See also *Board of County Commissioners v. Holbrook,* 314 Md. 210, 217, 550 A.2d 664 (1988); *Eastern Outdoor Advertising Co. v. Mayor and City Council of Baltimore,* 128 Md.App. 494, 524–28, 739 A.2d 854 (1999); *People's Counsel v. Mangione,* 85 Md.App. 738, 749–50, 584 A.2d 1318 (1991).

## C. Comparing Beneficial Purpose With Adverse Effect

Prior to any weighing of the relative severity of an adverse effect on different locations within a zone, however, there necessarily is the weighing of a proposed conditional use's beneficial purpose versus its adverse effect in the first instance. The Zoning Board is required to engage in such a weighing because, as *Schultz v. Pritts* pointed out, 291 Md. at 22, 432 A.2d 1319, "the beneficial purposes that such [uses] serve do not necessarily outweigh their possible adverse effects." Presumably, if on a given occasion the beneficial purpose actually outweighed the adverse effect, no further

weighing would be required. If, on the other hand, the adverse effect were weightier than the beneficial purpose, the assessment of the relative severity at different locations would then be called for.

### D. If a Locational Comparison Cannot Be Made, What Is Left to Compare?

█ The question raised by the rare circumstances of this case is whether the impossibility of making a locational comparison of relative severities obviates any need for the first comparison and dictates, rather, that any proposed conditional use that blankets an entire zone must always and automatically be granted. We hold that that is not the case.

If it were otherwise, a mere conditional use would thereby become a permitted use. Even when a locational comparison within a zone is a logical impossibility, as in this case, it is still appropriate for the Board of Zoning Appeals to assess a proposed use's adverse impact on the neighboring properties. Even in the absence of a locational comparison within a zone, other comparisons are still appropriate.

The Board might be able to determine, for example, that if a very small B–3–2 zone were completely surrounded by residential zoning, a particular conditional use might be inappropriate that would be appropriate if the B–3–2 zone were surrounded, instead, by an industrial zone, a commercial zone, or an agricultural zone. The Board might be able to determine, for instance, that a conditional use in a small B–3–2 zone completely surrounded by residential zoning and radiating its subversive influence, therefore, through 360 degrees of the compass has a greater deleterious effect then if the B–3–2 zone sits on the edge of the residential zone and casts its harmful rays through a significantly narrower arc.

Even within the same zoning geography, the intensity of the proposed conditional use could also be a factor. A large-scale operation of automobile storage, automobile repair, and body and fender work completely filling, and perhaps spilling over, the entire lot could well be deemed to constitute a degree of

adverse influence not constituted by a much smaller automobile repair operation as an auxiliary incident of a service station.

## E. Broadening the Locational Comparison

It may also be the case that even if a locational comparison of relative adverse influence could not be made **within** a particular zone, the adverse influence at the location in issue could still be compared with the likely adverse influences at other locations in other similar zones. Indeed, even though *Schultz v. Pritts* and its early progeny spoke of such comparisons of relative adverse influence "**within** the zone" and used the word "zone" only in the singular, Judge Cathell appeared to break out of that confining box in *Mossburg v. Montgomery County,* 107 Md.App. 1, 666 A.2d 1253 (1995). He compared the adverse influence of a solid waste transfer station not with such influence at other locations **within** the I–2 Industrial Zone in question but with such influences at locations in other I–2 Industrial Zones.

> The proper question is whether those adverse effects are above and beyond, *i.e.,* greater here than they would generally be elsewhere within *the areas of the County where they may be established, i.e., the other few I–2 Industrial Zones.* ... Once an applicant presents sufficient evidence establishing that his proposed use meets the requirements of the statute, even including that it has attached to it some inherent adverse impact, an otherwise silent record does not establish that that impact, however severe at a given location, is *greater at that location than elsewhere.*

107 Md.App. at 9, 666 A.2d 1253 (emphasis supplied).

In the holding of this Court, the zone within which the locational comparison was to be made was very definitely stated in the plural.

> This statement by the Board is not a finding of what is, but what may be. It is mere speculation, and not a finding of *present or future adverse impact that would be different*

*here than* elsewhere on Southlawn Lane or *in the other I–2 Zone areas of Montgomery County.*

107 Md.App. at 18, 666 A.2d 1253 (emphasis supplied).

In short, the logical impossibility of making a locational comparison of relative adverse impacts in the small B–3–2 zone in this case did not guarantee Futoryan an automatic approval of his conditional use application. The Board still had a discretionary role to play, and we affirm its exercise of that discretion.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**