956 A.2d 166

**PEOPLE'S COUNSEL FOR BALTIMORE COUNTY, et al.**

v.

**LOYOLA COLLEGE IN MARYLAND.**

No. 137 Sept.Term, 2007.

Court of Appeals of Maryland.

Sept. 9, 2008.

**56**

Peter Max Zimmerman (Carole S. Demilio, People's Counsel for Baltimore County, Towson, MD), on brief; G. Macy Nelson (Paul N. De Santis, Towson, MD), on brief, for Petitioners.

James A. Dunbar (Arnold E. Jablon and Christopher D. Mudd of Venable, LLP, Towson, MD), on brief, for Respondent.

ARGUED BEFORE BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, JOHN C. ELDRIDGE, (Retired, Specially Assigned), and IRMA S. RAKER, (Retired, specially assigned), JJ.

HARRELL, Judge.

The legacy in Maryland land use law of *Schultz v. Pritts*, 291 Md. 1, 432 A.2d 1319 (1981), has been beneficial and well-applied for the most part over the ensuing years. The synthesis of earlier cases threaded through its reasoning supplies a lucid explanation of the legislative calculus for why some land uses, at the time of original adoption or later amendment of the text of a zoning ordinance, are placed in the blessed category of permitted uses in a zone or zones while other uses in the same zone or zones receive a more measured imprimatur of presumptive compatibility as allowed only with the grant of a special exception or conditional use. *Schultz* also iterated how special exception uses are useful zoning tools for fleshing out the grand design of land use planning, as well as postulated an analytical paradigm for how individual special exception applications are to be evaluated. In carrying-out the latter goal, however, some of the language of Judge Davidson's opinion for the Court in *Schultz* occasionally has been mis-perceived by subsequent appellate courts and frequently misunderstood by some attorneys, planners, governmental authorities, and other citizens. We aim in the present case for greater clarity in explaining the proper evaluative framework for discrete special exception/conditional use applications and dispelling any lingering mis-understandings of what the Court truly intended when it filed the opinion in *Schultz* twenty-seven years ago.

## Facts and Procedural History

In October 2001, Loyola College in Maryland ("Loyola") contracted to purchase a fifty-three acre parcel (the Property) in northern Baltimore County for the purpose of constructing several buildings to be used for weekend spiritual retreats.

The Property is located in the R.C.2 (Resource Conservation) zone. According to the Baltimore County Zoning Regulations (BCZR) § 1A01.1(B), the purpose of the Resource Conservation zone is "to foster conditions favorable to a continued agricultural use of the productive agricultural areas of Baltimore County by preventing incompatible forms and degrees of urban uses." Among the permitted uses allowed as of right in the R.C.2 zone are "one-family detached" dwellings, "agricultural operations," "open space," and "public schools." BCZR § 1A01.2. BCZR § 1A01.2(C) allows "churches or other buildings for religious worship," "camps, including day camps," and "schools, including but not limited to private preparatory schools, colleges, business and trade schools, conservatories or other fine arts schools" as special exceptions in the R.C.2 zone.

In early 2004, Loyola submitted to Baltimore County a plan to develop the Property into a Retreat Center. The plan proposed development of just over ten of the fifty-three acres of the Property, leaving the balance in an "as is" state. Loyola concurrently filed a petition for special exception for the Retreat Center as a school or college, church, or camp.[1] The Baltimore County Zoning Commissioner/Hearing Officer, in April 2004, conducted a three-day hearing [2] on the development plan and special exception petition. The hearing officer issued an opinion and order on 10 June 2004 approving the

---

**1.** Petitioners here concede that the proposed Retreat Center falls within the special exception regulatory scheme as a "college," thus requiring a special exception.

**2.** Prior to the hearing, Loyola entered into a set of restrictive covenants with two community organizations operating in northern Baltimore County, Maryland Line Area Association and Parkton Area Preservation, Inc., restricting Loyola's use of the Property. The agreement provided, *inter alia*, that Loyola will not develop the Property beyond the then proposed development plan for a period of twenty-five years and certain buildings in the development will not be constructed for at least ten years. The covenants also restricted the operation of the Retreat Center. Under the terms of the agreement, Loyola is prohibited from operating the Retreat Center more than 160 days per year, hosting weddings or similar events, permitting storage or consumption of alcoholic beverages other than sacramental wine, or permitting Loyola

development plan and granting the special exception. A group of citizens acting individually and collectively as Citizens Against Loyola Multi-use Center ("Citizens")[3] appealed to the Baltimore County Board of Appeals (Board of Appeals).[4] The Board of Appeals held a *de novo* hearing[5] regarding the special exception and an appeal on the record regarding the development plan.[6] The combined hearing continued over a total of six days between 15 September 2004 and 4 January 2005.[7]

Both sides presented voluminous evidence regarding the effect that the proposed special exception use would have on the surrounding neighborhood. Because Petitioners narrowed the legal issue before this Court in their Petition for Certiorari, we shall summarize only the relevant evidence presented at the hearing. Loyola produced evidence, which the Board of Appeals credited, that the impacts of the proposed use on agriculture would be minimal. Loyola pointed out that the proposed Retreat Center would occupy only 10.18 acres of land, less than twenty percent of the Property. The remain-

---

students to be present on the Property without supervision from Loyola faculty or staff. In exchange for these promises, Maryland Line Area Association and Parkton Area Preservation, Inc. agreed not to oppose Loyola's development plan and petition for a special exception.

3. There are essentially two parties in the present litigation standing in opposition to Loyola's initiative, People's Counsel for Baltimore County ("People's Counsel") and Citizens Against Loyola Multi-use Center ("Citizens"). Collectively, we shall refer to the opponents as Petitioners.

4. It appears that People's Counsel for Baltimore County participated in the proceedings before the Board of Appeals in opposition to the development plan. He did not take a position then with regard to Loyola's request for a special exception.

5. BCZR § 501.6 states that "[a]ppeals from the Zoning Commissioner shall be heard by the board of zoning appeals de novo."

6. The development plan is not before us.

7. The evidence presented, or lack thereof, at the hearing regarding the special exception forms the basis of the controversy in this case. It will be summarized in some detail *infra*.

der of the Property would be used for agriculture or open space. Robert Sheelsey, an environmental consultant and licensed sanitarian, testified for Loyola that the Property is located "right on the fringe" of the agricultural zone and within the Interstate 83 corridor. Based on this evidence, the Board of Appeals concluded that the Retreat Center "will not harm agricultural activity in the vicinity." Loyola presented evidence that the outdoor lighting at the Retreat Center would be "dark skies compliant." Two additional experts testified on behalf of Loyola that the Retreat Center would not be detrimental to the neighborhood because "it was a very low intensity use" of the Property.

Substantial testimony at the hearing concerned the onsite septic system and water usage of the Retreat Center. Sheelsey testified that there are proper soils for septic discharge in the proposed septic field. He further explained that the discharge from the septic system would undergo "biological/biochemical pretreatment" prior to discharge, making the discharge "most likely 99% clear and treated." The proposed septic discharge system would contain a "flow equalization" mechanism to account for the nature of the use of the Retreat Center (heavy use for a few days followed by no use at all for the remainder of the week). Regarding water usage, Thomas Mills, an expert geologist, testified for Loyola that the "supply of groundwater was more than adequate" for the Retreat Center, even under drought scenarios, and that the Retreat Center's water usage would not affect neighboring wells.

There was controversy over the "thermal impacts" from proposed stormwater ponds at the Retreat Center. Citizens argued that discharges from the stormwater detention ponds would warm a tributary to the Fourth Mine Branch, described as a local trout stream, impairing the ability of the trout to reproduce. Professor Edward J. Bouwer of The Johns Hopkins University and Charles Gougeon of the Maryland Department of Natural Resources testified as to their belief that the run-off from the stormwater ponds would warm the tributary. Loyola countered with the testimony of an ecologist, Joseph Berg, Jr. Berg testified that the tributary would not be a

sustainable habitat for trout in any event. In addition, he testified that any impact from rain run-off would be minimal. In its written opinion, the Board of Appeals stated that it "was not persuaded by the testimony of Professor Bouwer or Mr. Gougeon...."

The parties also disputed the impact of nitrogen and phosphorous discharges from the septic system. Citizens presented the testimony of Professor Brian Reed of the University of Maryland. He took the position that guidelines from the Maryland Department of the Environment required that septic systems that discharged over 5,000 gallons per day needed further study. Sheelsey, in rebuttal testimony, pointed out that, with the proposed flow equalization mechanism in place, the septic system would discharge only 2,881 gallons per day. He also identified a study that indicated that the Retreat Center's nitrogen discharge is below the threshold deemed safe for drinking water. The Board found that Loyola met its burden regarding the nitrogen and phosphorous impacts.

Petitioners described Stablersville Road, the main ingress/egress public road for the Retreat Center, as being a narrow country road with no shoulder and steep banks on both sides. It was claimed to be impossible for traffic to pass safely around slow-moving farm vehicles that used the road to move from property to property. Terrence Sawyer, Vice President of Administration at Loyola, responded with the various steps Loyola will take to minimize the traffic impact from the Retreat Center. Students will arrive in vans or buses owned by Loyola. Deliveries and pickups would be made between the hours of 7:00 A.M. and 4:00 P.M. Loyola also produced a local Traffic Impact Analysis prepared by Wes Guckert, an expert on traffic engineering. Guckert testified that, assuming a worst case traffic scenario from the Retreat Center use, local critical intersections would continue to operate "at level A service" (the best volume operation level) without any detrimental effect. The Board of Appeals found his testimony to be credible and noted that "Loyola has made a concerted effort to keep traffic to and from the site to a bare minimum."

Citizens also presented certain evidence that the Board of Appeals chose not to consider. Citizens argued that the standard established in *Schultz*[8] for special exception applicants required Loyola to show that there are no other locations within the R.C.2 zone in Baltimore County where the proposed use would have less of an adverse effect than on the local neighborhood of the Property.[9] The Board of Appeals dismissed this argument, noting:

> We disagree with [Petitioners'] argument that [the *Schultz*] standard should be interpreted to mean that, as long as there are other locations in the zone in which certain adverse effects would be less adverse, the use should be

---

**8.** We will more fully analyze, *infra,* the particular language in *Schultz* that prompts the main issue in the present case:

> We now hold that the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any adverse effects above and beyond those inherently associated with such a special exception use irrespective of its location within the zone.

*Schultz,* 291 Md. at 22–23, 432 A.2d at 1331.

**9.** As Loyola noted in its brief to this Court, the exact formulation of Petitioners' argument has varied somewhat through different stages of this litigation. Before the Board of Appeals and in the Circuit Court, Citizens argued that the special exception applicant must show that there are no other locations within the R.C.2 zone where the proposed use would have less of an adverse impact. In this Court, however, Petitioners contend that the Board must consider the effects of the proposed use as if it were proposed at a reasonable number of other locations within the R.C.2 zone. The evolution (or inconsistency) in Petitioners' argument over time is irrelevant to the resolution of the underlying legal issue. The core of Petitioners' legal argument remains the same. They contend that *some* comparative geographic analysis of impacts of the proposed use at other R.C.2 sites is required under *Schultz.* The Board of Appeals refused, in error Petitioners argue, to require from Loyola or consider from Petitioners *any* comparative geographic analysis evidence. Thus, the various permutations of Petitioners' argument do not detract from the distinct and narrow legal issue before us in the present case. If Loyola is required to present a comparative geographic impact analysis, Loyola failed, as a matter of law, to meet its burden before the Board of Appeals. Thus, if any such comparative analysis is required, the decision of the Board of Appeals must be reversed.

denied in the subject location. The standard is very clear that only the general vicinity of the subject property is to be taken into account. Therefore, the fact that there are wider roads in other areas of the R.C.2 zone, or other areas of the zone without Class 3 trout streams, are beside the point. The Board must examine each criterion of BCZR Section 502.1[10] and determine whether the impacts in the subject location are above and beyond those inherent to the use—in this case, a college facility—itself.

Accordingly, the Board ignored evidence presented by Petitioners that there were other areas in the R.C.2 zone in Baltimore County that would be less adversely affected by the proposed use than the area surrounding the Property. Paul Solomon[11] testified to that effect on behalf of Petitioners. After explaining his methodology in searching for alternative locations, Solomon identified four other areas within the R.C.2 zone where the proposed use could be located "without the impact on the subject area." Specifically, Solomon identified the "Hanover Pike area in the west, the Granite area to the south, the Shawan Road area in the north central section, and the Bird River area to the southeast."[12] Solomon argued that

---

10. BCZR § 502.1 lists the criteria to be considered by the Board of Appeals in evaluating an application for a special exception. Section 502.1 is discussed *infra* pages 68–69.

11. Petitioners, particularly People's Counsel, discuss at length in their briefs to this Court the additional testimony of a local resident and expert farmer, Wayne McGinnis. It appears to us, however, that most of McGinnis's testimony focused on the adverse effects, particularly traffic and agriculture-related ones, of the Retreat Center on the area immediately surrounding the Property. He did not compare the adverse effects of the Retreat Center at the Property to adverse effects of the Retreat Center if it were located at other R.C.2 sites—the heart of the legal issue in this appeal. His testimony appears to have been afforded very little weight by the Board of Appeals in this regard. Petitioners, in their Petition for Writ of Certiorari, did not include any question presented that could be described fairly as encompassing a challenge to the weight afforded to McGinnis's testimony or any of the Board's factual findings that were contrary to McGinnis's testimony.

12. None of these areas could be described fairly as belonging to the same "neighborhood" as the Property. Each alternative site suggested by Solomon appears to be at least nine miles away from the Property.

the proposed use would have the least amount of adverse impact in areas where farms are smaller in size, and therefore less productive, and where there already were existing intrusions or developments within the adjacent farming community. Solomon surveyed 42 tax maps where the properties predominately were in the R.C.2 zone and where farming remained the central activity. He found that the area around the Property had the second highest number of parcels in agricultural use and the eighth largest average size of individual parcels. Therefore, he argued, the adverse effect of the Retreat Center would be particularly dramatic in its proposed location compared with the alternative R.C.2 sites he found and surveyed elsewhere in Baltimore County.

Lynne Jones also testified in opposition to the Retreat Center. She represented that she surveyed 28 roads traversing areas in largely R.C.2–zoned neighborhoods in Baltimore County. She found that the widths of the 28 roads ranged from 20 feet to 24 feet.[13] Some had shoulders extending up to nine feet wide. By comparison, Stablersville Road in the vicinity of the proposed Retreat Center is only 17 to 19 feet wide and lacks shoulders. Loyola did not dispute Jones's testimony.

Richard Klein, an environmental expert, testified regarding other potential sites for the proposed use in the R.C.2 zone elsewhere in the County. He identified vacant sites in the R.C.2 zone that consisted of ten acres or more, were not owned by a government agency, and were not located in a watershed with trout streams. He found four parcels in the Bird River area and 12 in the Granite area. At these locations, he argued, there would be no possible adverse impact from the proposed use on the (nonexistent) local trout populations.

Loyola, by contrast, presented no evidence regarding how its Retreat Center proposal would operate at other sites in Baltimore County in the R.C.2 zone. Thus, Solomon's,

---

**13.** It appears from the record that Jones was referring to pavement width, rather than right-of-way width.

Jones's, and Klein's testimonies largely were uncontradicted by the applicant for the special exception and ignored by the Board.

The Board of Appeals held public deliberations on 24 March 2005. On 21 June 2005, the Board, in a written opinion, affirmed the conclusions of the hearing officer with regard to the development plan and granted Loyola's petition for a special exception as a "college."

Citizens timely filed, in the Circuit Court for Baltimore County, a Petition for Judicial Review of the Board of Appeals's decision. People's Counsel filed a Petition for Judicial Review as well.[14] The Circuit Court remanded the case to the Board of Appeals for further action. Specifically, the Circuit Court held that the "appropriate geographic scope of inquiry is a broad, comprehensive, zone-wide analysis." Thus, the Circuit Court concluded that the Board "did err as a matter of law and misapplied the special exception standards of *Schultz* in restricting its geographic scope of inquiry." Loyola appealed to the Court of Special Appeals. In an unreported opinion, the intermediate appellate court vacated the Circuit Court's judgment and remanded the case with instructions to affirm the decision of the Board of Appeals. We granted the Petition for Writ of Certiorari filed by Citizens and People's Counsel. 403 Md. 612, 943 A.2d 1244 (2008). Although the Petition presents three questions for our review,[15] all three questions

---

14. The Circuit Court ultimately noted that the interests and arguments of Citizens and People's Counsel "overlap substantially." The Circuit Court addressed the issues raised in both petitions in a single memorandum opinion and order.

15. Specifically, the three questions presented by the Petition for Writ of Certiorari were:

1. Whether the County Board of Appeals erred as a matter of law, misapplied, undermined, and rendered nugatory the special exception standards of *Schultz v. Pritts* and its progeny when it artificially narrowed its geographic scope of inquiry, refused to consider or compare area adverse impacts relative to other locations "anywhere within the zone," or "irrespective of its location within the zone," and disregarded as irrelevant undisputed testimony of the greater

share a common legal theme.[16] Thus, the sole legal issue in this case properly may be distilled into a sole question presented:

> Does *Schultz v. Pritts*, 291 Md. 1, 432 A.2d 1319 (1981), require that, before of a special exception may be granted, an applicant must adduce evidence of, and the zoning body must consider, a comparison of the potential adverse effects of the proposed use at the proposed location to the potential adverse effects of the proposed use at other, similarly-zoned locations throughout the jurisdiction?

We conclude that *Schultz* imposes no such requirement. Thus, we affirm the judgment of the Court of Special Appeals.

### Standard of Review

When we review the final decision of an administrative agency, such as the Board of Appeals, we look "through the circuit court's and intermediate appellate court's decisions, although applying the same standards of review, and evaluate[ ] the decision of the agency." *People's Counsel for Balt. County v. Surina*, 400 Md. 662, 681, 929 A.2d 899, 910 (2007). "Judicial review of administrative agency action is narrow. The court's task on review is not to substitute its judgment for the expertise of those persons who constitute the administra-

---

adverse area impact of Loyola's use at the Parkton site than at other potential locations in the Agricultural Zone in Baltimore County?
2. Did Loyola's tactical choice not to do any comparative geographic evaluation of area adverse impacts, insistence on the irrelevance of the comparative analysis by the citizens' planning expert, and demand for approval, regardless, result in a failure to produce evidence legally sufficient to meet the *Schultz* standards? Should the [County Board of Appeals], therefore, have denied the special exception as a matter of law?
3. Did the Court of Special Appeals depart from reported precedents implementing a reasonable comparative analysis and misstate People's Counsel's position as demanding an impractical "minimum impact" criterion and evaluation of every property in the zone in order to rationalize the [County Board of Appeals's] grant of the special exception?

**16.** As Citizens candidly noted in their reply-brief, "[t]his appeal presents a purely legal question concerning the requirements of the *Schultz v. Pritts* test."

tive agency...." *United Parcel Serv., Inc. v. People's Counsel for Balt. County,* 336 Md. 569, 576–77, 650 A.2d 226, 230 (1994) (quotation omitted). In our review, "we inquire whether the zoning body's determination was supported by 'such evidence as a reasonable mind might accept as adequate to support a conclusion....'" *Surina,* 400 Md. at 681, 929 A.2d at 910 (quoting *Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 398, 396 A.2d 1080, 1089 (1979)). "As we have frequently indicated, the order of an administrative agency, such as a county zoning board, must be upheld on review if it is not premised upon an error of law and if the agency's conclusions reasonably may be based upon the facts proven." *Ad + Soil, Inc. v. County Comm'rs of Queen Anne's County,* 307 Md. 307, 338, 513 A.2d 893, 909 (1986) (internal quotation omitted).[17]

There is some dispute mounted in the present case as to the appropriate standard of review to be afforded the Board of Appeals's legal conclusions. Loyola argues that the Board of Appeals's legal analysis is to be afforded some deference. To support this proposition, Loyola relies on *Marzullo v. Kahl,* 366 Md. 158, 172, 783 A.2d 169, 177 (2001), where we stated that "[e]ven with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts." This argument is without merit. By its own terms, the deference "often ... accorded" an agency's interpretation extends only to the application of the statutes or regulations that the agency administers. The controversy before us concerns the proper application and analysis of caselaw, specifically *Schultz v. Pritts* and its progeny. This is a purely legal issue uniquely within the ken of a reviewing

---

**17.** It is this standard of review that frames the analysis in this case. Petitioners' sole issue raised in the Petition for Writ of Certiorari is that the Board of Appeals erred in applying the *Schultz v. Pritts* standard. Petitioners abandoned their arguments that the Board of Appeals's factual findings were incorrect.

court. "Generally, a decision of an administrative agency, including a local zoning board, is owed no deference when its conclusions are based upon an error of law." *Belvoir Farms Homeowners Ass'n, Inc. v. North*, 355 Md. 259, 267–68, 734 A.2d 227, 232 (1999). Thus, the Board of Appeals's legal conclusions, if erroneous, are entitled to no deference.

### Standards Governing Special Exceptions

As noted earlier, § 502.1 of the BCZR provides:

Before any special exception may be granted, it must appear that the use for which the special exception is requested will not:

A. Be detrimental to the health, safety or general welfare of the locality involved;

B. Tend to create congestion in roads, streets or alleys therein;

C. Create a potential hazard from fire, panic or other danger;

D. Tend to overcrowd land and cause undue concentration of population;

E. Interfere with adequate provisions for schools, parks, water, sewerage, transportation or other public requirements, conveniences or improvements;

F. Interfere with adequate light and air;

G. Be inconsistent with the purposes of the property's zoning classification nor in any other way inconsistent with the spirit and intent of these Zoning Regulations;

H. Be inconsistent with the impermeable surface and vegetative retention provisions of these Zoning Regulations; nor

I. Be detrimental to the environmental and natural resources of the site and vicinity including forests, streams, wetlands, aquifers and floodplains in an R.C.2, R.C.4, R.C.5 or R.C.7 Zone.

■ Within each individual factor, including the general factor in § 502.1(A) of the BCZR, lurks another test, the

*Schultz v. Pritts* standard. *Harford County v. Earl E. Preston, Jr., Inc.,* 322 Md. 493, 500, 588 A.2d 772, 776 (1991) (noting that the *Schultz v. Pritts* test applies "with respect to a given factor" (quoting *Gotach Ctr. for Health v. Bd. of County Comm'rs of Frederick County,* 60 Md.App. 477, 484–85, 483 A.2d 786, 790 (1984))); *Mossburg v. Montgomery County,* 107 Md.App. 1, 21, 666 A.2d 1253, 1263 (1995) (noting that the test announced in *Schultz* essentially adds language to statutory factors to be considered in evaluating proposed special exceptions). In this respect, the *Schultz* analytical paradigm is not a second, separate test (in addition to the statutory requirements) that an applicant must meet in order to qualify for the grant of a special exception. Rather, the *Schultz* explication speaks to two different contexts, one by which a legislative body decides to classify a particular use as requiring the grant of a special exception before it may be established in a given zone, and a second one by which individual applications for special exceptions are to be evaluated by the zoning body delegated with responsibility to consider and act on those applications in accordance with criteria promulgated in the zoning ordinance. *See Earl E. Preston, Jr., Inc.,* 322 Md. at 500, 588 A.2d at 776 (noting that the *Schultz* test is "normally regarded as consistent with general legislative intent" (quoting *Gotach,* 60 Md.App. at 484–85, 483 A.2d at 790)); *see also Earl E. Preston, Jr., Inc.,* 322 Md. at 503, 588 A.2d at 777 ("Reading all of the provisions which pertain to special exceptions together, as we must to ascertain the intention of the County Council, we find no intention on the part of the [Harford] County Council to substitute a *Gowl [v. Atlantic Richfield Co.,* 27 Md.App. 410, 341 A.2d 832 (1975)]*[18] test for the test applicable generally for measuring the adverse impact of a proposed special exception use which

---

**18.** In *Gowl v. Atlantic Richfield Co.,* 27 Md.App. 410, 417, 341 A.2d 832, 836 (1975), the Court of Special Appeals held that the adverse effects caused by a proposed use in an "application for a special exception ought to be measured against that which could arise under permissible use...." The *Gowl* test was rejected by this Court in *Schultz.*

we adopted in *Schultz.*"). We shall explain how we arrived at this conclusion in some necessary detail.

## In The Beginning ...

In *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303 (1926), the U.S. Supreme Court upheld Euclid's (a suburb of Cleveland) comprehensive zoning ordinance against a challenge brought by a local landowner. Forever named Euclidean zoning, the type of zoning regulations enacted by Euclid represented a "fairly static and rigid form of zoning." *Mayor & Council of Rockville v. Rylyns Enterprises, Inc.*, 372 Md. 514, 534, 814 A.2d 469, 480 (2002) *(Rylyns)*. "Generally, by means of Euclidean zoning, a municipality divides an area geographically into particular use districts, specifying certain uses for each district. 'Each district or zone is dedicated to a particular purpose, either residential, commercial, or industrial,' and the 'zones appear on the municipality's official zoning map.'" *Rouse–Fairwood Dev. Ltd. P'ship v. Supervisor of Assessments for Prince George's County*, 138 Md.App. 589, 623, 773 A.2d 535, 555 (2001) (quoting 5 ZIEGLER, RATHKOPF'S THE LAW OF ZONING AND PLANNING § 63.01 (4th Ed. Rev. 1994)). "Euclidian zoning is designed to achieve stability in land use planning and zoning and to be a comparatively inflexible, self-executing mechanism which, once in place, allows for little modification beyond self-contained procedures for predetermined exceptions or variances." *Rylyns*, 372 Md. at 534, 814 A.2d at 481.

"Baltimore County is a charter county pursuant to Article XI–A of the Maryland Constitution." *United Parcel Serv., Inc.*, 336 Md. at 581, 650 A.2d at 232. As a charter county, Maryland Code (1957, 2005 Repl. Vol.), Article 25A, § 5(X)(1)(i) authorizes Baltimore County to enact local laws for the protection and promotion of public safety, health, morals, and welfare, relating to zoning and planning. *See also Earl E. Preston, Jr., Inc.*, 322 Md. at 501, 588 A.2d at 776 (noting that a charter county was "authorized to divide the county into use districts and to determine which uses would be

permitted within each district as a matter of right (permitted uses) and which uses would only be permitted under certain conditions (special exceptions)"); *Glascock v. Balt. County,* 321 Md. 118, 121, 581 A.2d 822, 824 (1990) (stating that Maryland Code (1957, 2005 Repl. Vol.), Article 25A, § 5(X) "grants Baltimore County its authority to enact a zoning ordinance").

 The zoning device at the heart of the present case, the special exception,[19] introduces some flexibility to a "fairly static and rigid" Euclidean zoning scheme. *See Rylyns,* 372 Md. at 541, 814 A.2d at 485 (2002) ("Another mechanism allowing some flexibility in the land use process, without abandoning the uniformity principle, is the 'special exception' or 'conditional use.' "). The special exception adds flexibility to a comprehensive legislative zoning scheme by serving as a "middle ground" between permitted uses and prohibited uses in a particular zone. Permitted and prohibited uses serve as binary, polar opposites in a zoning scheme. A permitted use in a given zone is permitted as of right within the zone, without regard to any potential or actual adverse effect that the use will have on neighboring properties. A special exception, by contrast, is merely deemed *prima facie* compatible in a given zone. The special exception requires a case-by-case evaluation by an administrative zoning body or officer according to legislatively-defined standards. That case-by-case evaluation is what enables special exception uses to achieve some

---

**19.** The terms "special exception" and "conditional use" are essentially interchangeable. *See Md. Overpak Corp. v. Mayor & City Council of Balt.,* 395 Md. 16, 30 n. 12, 909 A.2d 235, 243 n. 12 (2006) (stating that "a 'conditional use' has an alias by which it is sometimes known elsewhere in Maryland, a 'special exception,' although the two terms are largely synonymous"); *Futoryan v. Mayor & City Council of Balt.,* 150 Md.App. 157, 159, 819 A.2d 1074, 1075 (2003) ("Although we will in this opinion be using the term 'conditional use' some of the case law we cite may use the term 'special exception.' They mean exactly the same thing."); *Lucas v. People's Counsel For Balt. County,* 147 Md.App. 209, 227 n. 20, 807 A.2d 1176, 1187 n. 20 (2002) ("In Maryland, the terms 'special exception' and 'conditional use' are effectively synonymous.").

flexibility in an otherwise semi-rigid comprehensive legislative zoning scheme.[20]

## History of the Special Exception in Maryland

One of our earliest cases to mention and discuss meaningfully the special exception as a zoning tool[21] is *Heath v. Mayor & City Council of Baltimore*, 187 Md. 296, 49 A.2d 799 (1946) (*Heath I*), although the case apparently uses the term in a different sense than it is used today. In *Heath I*, nearby landowners challenged the Baltimore City Board of Zoning Appeals's decision to permit their neighbor to erect a two-car garage. At the time, the Baltimore City Zoning Ordinance permitted the Board of Zoning Appeals to grant special exceptions to such garages in residential areas. We noted that an "'exception' within the meaning of a zoning ordinance is a dispensation permissible where the Board of Zoning Appeals finds existing those facts and circumstances specified in the ordinance as sufficient to warrant a deviation from the general rule." *Heath I*, 187 Md. at 303, 49 A.2d at 803. The Baltimore City Zoning Ordinance "empower[ed] the Board of Zoning Appeals to make special exceptions or variances only where the proposed building, alteration, or use 'shall not create hazards from fire or disease or shall not menace the public health, security, or morals.' It then provides that the board, in passing upon applications for special exceptions or variances as to use, height, or area, shall give consideration to the various factors enumerated in [the Zoning Ordinance]." *Heath I*, 187 Md. at 302–03, 49 A.2d at 803. Although we held that the Board of Zoning Appeals had authority to grant the

---

**20.** We should not be thought to understand that special exception uses are only countenanced in Euclidean zones. Similar provisions exist in floating zones. *See, e.g.,* Prince George's County Code § 27–547 (listing permitted uses and special exception uses for floating mixed-use zones).

**21.** Several earlier cases mentioned the use of the special exception device, but only in passing, while addressing the constitutional or legal validity of a zoning ordinance. *See, e.g., Jack Lewis, Inc., v. Mayor & City Council of Baltimore*, 164 Md. 146, 164 A. 220 (1933); *Sugar v. N. Balt. Methodist Protestant Church*, 164 Md. 487, 495, 165 A. 703 (1933).

special exception, we reversed its decision because it failed to fairly describe the rationale and supporting facts for its decision. We noted that

> in passing on an application for a special exception in a residential use district, the Board of Zoning Appeals must take into consideration all pertinent factors enumerated in Section 1, such as fire hazards, traffic problems, transportation requirements and facilities, streets and paving, and schools, parks and playgrounds, and its action must be reasonable in the light of these and all other pertinent facts. In this case the board announced merely that it had 'made a study of the premises and neighborhood,' and there was no supporting evidence upon which to base a rational judgment.

*Heath I,* 187 Md. at 305, 49 A.2d at 804.

From a modern vantage point, the zoning device at the heart of *Heath I* actually resembles more the notion of a variance. When the case again came to the Court of Appeals after remand, the Court, applying an analysis grounded in hardship consideration, treated the granting of the special exception as if the applicant were seeking a variance.[22] *Heath v. Mayor & City Council of Balt.,* 190 Md. 478, 483–484, 58 A.2d 896, 898 (1948) (*Heath II*). This appears to have been a frequent conflation in cases from that era. The use of the term "special exception" in the *Heath* cases seems to have had a different meaning than the one given to the phrase by more recent Maryland land use jurisprudence. *See, e.g., Easter v. Mayor & City Council of Balt.,* 195 Md. 395, 400, 73 A.2d 491, 492 (1950) ("The burden of showing facts to justify a[ ] [special] exception or variance rests upon the applicant, and it must be shown that the hardship affects the particular premises and is not common to other property in the neighbor-

---

**22.** " 'A variance refers to administrative relief which may be granted from the strict application of a particular development limitation in the zoning ordinance (i.e., setback, area and height limitations, etc.).' " *Mayor & Council of Rockville v. Rylyns Enterprises, Inc.,* 372 Md. 514, 537, 814 A.2d 469, 482 (2002) (quoting STANLEY D. ABRAMS, GUIDE TO MARYLAND ZONING DECISIONS, § 11.1 (3d ed., Michie 1992)).

hood."); *Mayor & City Council of Balt. v. Biermann*, 187 Md. 514, 50 A.2d 804; *Cleland v. Mayor & City Council of Balt.*, 198 Md. 440, 444, 84 A.2d 49, 51 (1951). For example, in *Gleason v. Keswick Imp. Ass'n*, 197 Md. 46, 50, 78 A.2d 164, 165 (1951), the Court repeatedly noted that the applicants in that case were seeking a "special exception." Over 50 years later, in analyzing *Gleason*, we deduced that the opinion actually addressed a zoning re-classification, variance, or "alternate classification possibility." *Richard Roeser Prof'l Builder, Inc. v. Anne Arundel County*, 368 Md. 294, 299, 793 A.2d 545, 549 (2002); *see also Zengerle v. Bd. of County Comm'rs for Frederick County*, 262 Md. 1, 21, 276 A.2d 646, 656 (1971) (describing *Gleason* as a variance case). The distinction between a variance and special exception was not clarified definitively in our caselaw until *Montgomery County v. Merlands Club, Inc.*, 202 Md. 279, 96 A.2d 261 (1953) (*Merlands Club*).

In *Merlands Club*, we reviewed the refusal by the Board of Appeals of Montgomery County to grant a special exception for a private recreational club. In reversing the Board's decision, we held that the special exception provision in the zoning ordinance "delegate[s] to the Zoning Board a limited authority to permit enumerated uses which the legislative body finds in effect *prima facie* properly residential, absent any fact or circumstance in a particular case which would change this presumptive finding. The duties given the Board are to judge whether the neighboring properties and the general neighborhood would be adversely affected, and whether the use, in the particular case, is in harmony with the general purpose and intent of the zoning plan.[23]" *Merlands*

---

23. *Merlands Club* requires that a special exception applicant show that the proposed use is in "general harmony with the zoning plan." *Merlands Club*, 202 Md. at 290, 96 A.2d at 265. The reference to the "zoning plan" in *Merlands Club*, and later zoning opinions of this Court and others, appears to have caused some confusion as to with which "plan" a special exception must be in "general harmony." Part of this confusion stems from the less than meticulous differentiation of the variety of treatments of this and similar phrases in zoning ordinances and regulations of different counties and municipalities Maryland

**Courts have been called upon to interpret.** In addition, the language from *Merlands Club* requiring a special exception applicant to show some level of relativity to a "zoning plan" has become part of a boilerplate chant frequently and indiscriminately repeated in later zoning opinions. That unqualified repetition, occasionally lacking in judicial precision, is also responsible for the confusion. We shall endeavor to clarify the point here.

In *Merlands Club*, a Montgomery County zoning ordinance provision explicitly required that decisions of the Board of Appeals regarding special exceptions "be in harmony with the general purpose and intent of the zone plan embodied in these Zoning Regulations and the Zoning Map." *Merlands Club*, 202 Md. at 283, 96 A.2d at 262. Thus, the language in *Merlands Club* requiring "general harmony with the zoning plan" is referring to the zoning ordinance text and the legal document establishing the current zoning of every property in the jurisdiction, the zoning map—not to a land planning document such as a master plan, general plan, or functional master plan. Most subsequent cases utilizing this, or similar, language also refer to the zoning ordinance and/or the zoning map when employing the same or similar term.

For example, *Oursler v. Board of Zoning Appeals of Baltimore County*, 204 Md. 397, 402, 104 A.2d 568, 570 (1954), cites *Merlands Club* as support for the assertion that a special exception applicant "must show only that the exception would be in harmony with the zoning plan." In describing the statutory authorization for special exceptions in Baltimore County, we noted that "[i]n 1943 the Legislature passed an amendment to the Zoning Enabling Act authorizing the County Commissioners to provide that the Zoning Commissioner may make special exceptions to the Zoning Regulations in harmony with their general purposes and intent." *Oursler*, 204 Md. at 400, 104 A.2d at 569. In *Crowther, Inc. v. Johnson*, 225 Md. 379, 385, 170 A.2d 768, 771 (1961), we cited to the language in *Oursler* and *Merlands Club* when considering testimony that a proposed special exception would be "out of step with the comprehensive zoning plan." *See also Crowther*, 225 Md. at 383, 170 A.2d 768, 770 (noting that a zoning body "is given a wide latitude of discretion in passing upon special exceptions so long as the resulting use is in harmony with the general purpose and intent of *the zoning plan and will not adversely affect the use of neighboring properties and the general plan of the neighborhood as provided by the zoning ordinance*" (emphasis added)).

In fact, we have characterized a zoning ordinance as a comprehensive plan. In *Huff v. Board of Zoning Appeals of Baltimore County*, 214 Md. 48, 51, 133 A.2d 83, 85 (1957), we held that a comprehensive zoning ordinance constituted a "comprehensive plan." We noted the statutory authority of the county to enact zoning laws, stating that the "statute now found in the Code of Public Local Laws of Baltimore County, 1955, Title 30, Sec. 532, provided, at the times here material, that the County Commissioners were empowered to enact zoning regulations '. . . in accordance with a comprehensive plan.'" Opponents of a zoning reclassification argued that the reclassification was improper because it was not "in accordance with a comprehensive plan" as required by the statute. We held that "the Baltimore County zoning regulations of 1955, including the provisions as to Manufacturing,

Restricted zones, constitute a comprehensive plan." *Huff,* 214 Md. 48, 59, 133 A.2d 83, 89.

In *Turner v. Hammond,* 270 Md. 41, 55, 310 A.2d 543, 551 (1973), we noted that a proposed use could not be approved as a special exception if it caused "disharmony to the functioning of the comprehensive plan." The comprehensive plan referred to in *Turner* was the zoning ordinance. The *Turner* opinion relied on two cases for this language, *Merlands Club,* discussed *supra,* and *Rockville Fuel & Feed Co. v. Board of Appeals of City of Gaithersburg,* 257 Md. 183, 262 A.2d 499 (1970). *Rockville Fuel,* in turn, relied upon *Merlands Club* and *Oursler* in its discussion of the requirement that a special exception conform to a zoning plan. *See also Rockville Fuel,* 257 Md. at 190, 262 A.2d at 503 ("The legislative body of the City of Gaithersburg has in effect said that if certain standards and requirements enumerated in the ordinance are met in a particular case, the various special exceptions specifically authorized *are a part of the comprehensive zoning plan* and therefore promote the health, safety and general welfare, to the same extent as do the uses permitted as of right in the zone involved." (emphasis added)). Thus, the "comprehensive plan" referred to in *Turner* is the zoning ordinance. *See also Turner,* 270 Md. at 54, 310 A.2d at 550 (noting that "the conditional use or special exception, as it is generally called, *is a part of the comprehensive zoning plan* sharing the presumption that as such it is in the interest of the general welfare and, therefore, valid." (emphasis added)).

In *Anderson v. Sawyer,* 23 Md.App. 612, 617, 329 A.2d 716, 720 (1974), Judge Rita Davidson noted that a proposed use must be in harmony with the "comprehensive plan." That reference, as well, was to the county zoning ordinance as a whole. The Court of Special Appeals stated:

> But in the instant case the legislature of Baltimore County has determined that as part of its comprehensive plan funeral homes are to be allowed in residential zones notwithstanding their inherent deleterious effects. By defining a funeral home as an appropriate use by way of special exception, the legislature of Baltimore County has, in essence, declared that such uses, if they satisfy the other specific requirements of the ordinance, do promote the health, safety and general welfare of the community. As part of the comprehensive zoning plan this legislative declaration shares in a presumption of validity and correctness which the courts will honor.

*Anderson,* 23 Md.App. at 624, 329 A.2d at 724. It is apparent from this passage that *Anderson* is describing the legislative process in enacting or amending a zoning ordinance, where a legislative body divides those uses permitted in a Euclidean zone as of right from those requiring a special exception. In addition, *Anderson* uses the terms "comprehensive plan" and "comprehensive plan of zoning" interchangeably in consecutive sentences. *See Anderson,* 23 Md.App. at 617, 329 A.2d at 720 ("If the evidence makes the question of harm or disturbance or the question of the disruption of the harmony of the *comprehensive plan of zoning* fairly debatable, the matter is one for the Board to decide. But if there is no probative evidence of harm or disturbance in light of the nature of the zone involved or of factors causing disharmony to the operation of the *comprehensive plan,* a denial of an application for a

*Club*, 202 Md. at 287–88, 96 A.2d at 264 We further noted that "where a specific use is permitted by the legislative body in a given area if the general zoning plan is conformed to and there is no adverse effect on the neighborhood, the application can be granted. . . ." *Merlands Club*, 202 Md. at 289, 96 A.2d at 265. Describing the presumption afforded special exception uses, we noted that "private clubs are *prima facie* to be permitted in a residential use area. The applicant for such a use need not show either practical difficulty, unnecessary hardship, or great urgency, but only that the project is a private club and that it would be in general harmony with the zoning plan and would not adversely affect the neighboring properties and the general neighborhood." *Merlands Club*, 202 Md. at 290, 96 A.2d at 265. Thus, in *Merlands Club*, the Court discarded the consideration generally of hardship as part of the special exception analysis, unless the particular zoning ordinance explicitly injects hardship as a factor.

---

special exception is arbitrary, capricious and illegal." (emphasis added)).

To be sure, a legislature validly may require that an applicant for a special exception show that a proposed use is in conformance, is consistent, or is in harmony with a land planning document, such as a general plan, master plan, or functional master plan. For example, in *Board of County Commissioners for Prince George's County v. Luria*, 249 Md. 1, 2 n. 2, 238 A.2d 108, 109 n. 2 (1968), the zoning ordinance then in effect in Prince George's County stated that "[a] special exception may be granted when the Council finds that . . . proposed use is in harmony with the purpose and intent of the General Plan for the physical development of the District as embodied in this Ordinance and in any Master Plan or portion thereof adopted or proposed as part of said General Plan." That language from the Prince George's County zoning ordinance was repeated in *Cason v. Board of County Commissioners for Prince George's County*, 261 Md. 699, 706–07, 276 A.2d 661, 664 (1971). Currently, § 27–317(a)(3) of the Prince George's County Code (zoning ordinance) requires that, in order for a special exception to be approved, the proposed use must "not substantially impair the integrity of any validly approved Master Plan or Functional Master Plan, or, in the absence of a Master Plan or Functional Plan, the General Plan." Thus, typically and at least in special exception cases originating in Prince George's County, a judicial reference in an appellate opinion to a requirement that a proposed use conform to a land planning document may not be referring to the zoning ordinance alone or at all.

We later considered the teachings of *Merlands Club* in the context of special exceptions provided for in the zoning ordinance in Baltimore County. In *Oursler v. Board of Zoning Appeals of Baltimore County,* 204 Md. 397, 104 A.2d 568 (1954) (our first substantial opportunity to examine the regulation of special exceptions in Baltimore County), we affirmed an order of the Baltimore County Board of Zoning Appeals granting a special exception (in *Oursler* it was referred to as a "special permit") to operate a restaurant in a residential area. The zoning ordinance section governing special exceptions in effect at that time was identical to the current version of BCZR § 502.1(a) through (f). In applying the zoning ordinance, we noted:

> It is the function of the Zoning Commissioner, and the Board of Zoning Appeals on appeal, to determine whether or not any proposed use for which a special permit is sought would be in harmony with the general purposes and intent of the Zoning Regulations, and whether it could be conducted without being detrimental to the welfare of the neighborhood. Accordingly, in Baltimore County, where restaurants are *prima facie* permissible in residential zones, an applicant for a permit to conduct a restaurant in a residential zone is not required to show that denial of a permit would result in "practical difficulty, or unnecessary or unreasonable hardship," as in the case of a variance, but must show only that the exception would be in harmony with the zoning plan and would not be detrimental to the welfare of the neighborhood.

*Oursler,* 204 Md. at 401–02, 104 A.2d at 570; *See also Erdman v. Board of Zoning Appeals of Balt. County,* 212 Md. 288, 295–296, 129 A.2d 124, 127 (1957) (applying and quoting *Oursler*).

In *Gilmor v. Mayor and City Council of Baltimore,* 205 Md. 557, 109 A.2d 739 (1954), the Baltimore City Board of Municipal and Zoning Appeals granted a permit [24] to erect a billboard

---

**24.** Although the *Gilmor* opinion refers to the granting of a "permit," the case clearly is directed to what would be considered today a special exception. The Baltimore City Zoning Ordinance in effect at the time

in a "first commercial use" district. We affirmed and discussed the legislative presumption afforded special exception "permits":

> The argument of the appellants that the erection of a billboard in a first commercial use district, in which there are residences, would lead to slums and, in this way, in the future affect adversely the public health or safety, is an argument that billboards should not be permitted at all in a district in which there are residences or substantial and attractive businesses, although it is zoned first commercial. Whatever the merits of this argument, it is one which should be addressed to the Legislature or the Baltimore City Council in an effort to have the law changed. As the law now stands, the argument is fanciful. The legislative branch of the government, in allowing billboards to be erected in such areas, has said, in effect, that the likelihood that their presence will bring about the dire consequences foreseen by the appellant, is not great enough to forbid generally the use of property to accommodate them. It has added a safeguard for the instances contrary to the general rule in the procedures required by Sections 37, 38 and 39 of the Ordinance, whereby the Board, as a legislative agent, may determine in any particular instance that the public health, safety, welfare, security and morals will be affected—not in the deterioration of the neighborhood over a period of time because of the presence of the billboards, but because of some immediate fact, circumstance or condition which would bring about the evils guarded against.

*Gilmor*, 205 Md. at 565, 109 A.2d at 743.

In 1957, we decided *Huff v. Board of Zoning Appeals of Baltimore County*, 214 Md. 48, 133 A.2d 83 (1957). *Huff* was not a special exception case, but is nonetheless helpful to our

---

required a permit for billboards to be erected in "first commercial, second commercial, and industrial use districts." The Baltimore City Board of Municipal and Zoning Appeals was only permitted to issue such a permit following a public hearing. The permit was to be denied if "such proposed use" "would menace public health, safety, security or morals...."

analysis here because *Huff* compared the special exception tool to another, similar zoning device. In *Huff,* the local legislature enacted a zoning tool which would be described in modern zoning terminology as a "floating zone."[25] A landowner meeting certain statutory requirements (such as minimum lot size and parking requirements) could petition for his property to be zoned "Manufacturing, Restricted." The decision whether to grant a petition was to be made in the first instance by the Zoning Commissioner with the right of appeal to the Board of Zoning Appeals. The statute further stated that such a rezoning was intended "to protect the uses in neighboring residential zones" and that "the building and grounds must be continuously maintained so that they will not adversely affect vicinal properties." *Huff,* 214 Md. at 59, 133 A.2d at 89.

In upholding the legislation creating the "Manufacturing, Restricted" floating zone, we noted:

We read the provisions of the regulations as to the purpose and intent in establishing [Manufacturing, Restricted] Zones and as to the mechanics employed to be sure that the plan approved will continue to "protect the uses in neighboring residential zones" and not adversely affect "vicinal properties," to mean that an area cannot be properly zoned or rezoned Manufacturing, Restricted unless in actual opera-

---

**25.** In *Rylyns,* we described the "floating zone":

"This device is the creation of special use districts for these various uses, which at the time are unlocated districts, but which can be located by a petition of a property owner desiring to develop his specific tract for any of these special uses. Such unlocated special zoning districts are popularly referred to as 'floating zones,' in that they float over the entire municipality until by application of a property owner one of these special zones descends upon his land thereby reclassifying it for the special use. The zoning ordinance is carefully drawn so as to impose restrictive use limitation upon the owner in these special use zones in order to protect the adjoining residential areas. Usually there is a minimum lot requirement with large set-back restrictions for the structures, both from the streets and from the adjoining residences."

*Rylyns,* 372 Md. at 539 n. 15, 814 A.2d at 484 n. 15 (quoting *Eschinger v. Bus,* 250 Md. 112, 118–19, 242 A.2d 502, 505–06 (1968)).

tion and effect it will be a harmonious part of the comprehensive plan and serve the purposes of the enabling act; that is, that the zoning will be not only in the public good but in the interests of nearby property owners. If the regulations be read as we read them, it is clear that the Manufacturing, Restricted classification is analogous to a special exception, and the rules which are applicable to special exceptions would apply, not the general rules of original error or change in conditions or the character of the neighborhood, that control the propriety of rezoning. This is because, as in the case of a special exception, there has been a prior legislative determination, as part of a comprehensive plan, that the use which the administrative body permits, upon application to the particular case of the specified standards, is *prima facie* proper in the environment in which it is permitted. This prior determination and the establishment of sufficient standards effectively refute the claim of improper delegation of legislative power.

*Huff,* 214 Md. at 62, 133 A.2d at 91.

*Merlands Club* and *Oursler* were cited favorably in *Crowther, Inc. v. Johnson,* 225 Md. 379, 383, 170 A.2d 768, 770 (1961), another Baltimore County land use case. In *Crowther,* we affirmed the Board of Appeals's denial of a special exception to operate a trailer home park in the "Manufacturing, Light" zone. We began our analysis by noting the appropriate standard to be applied in evaluating an application for a special exception by noting that "conditions upon which a special exception may be granted are set out in the ordinance, and the board is given a wide latitude of discretion in passing upon special exceptions so long as the resulting use is in harmony with the general purpose and intent of the zoning plan and will not adversely affect the use of neighboring properties and the general plan of the neighborhood as provided by the zoning ordinance." We determined that substantial evidence supported the Board's denial of the special exception "(a) because it would be inconsistent with the continued development of a planned and existing, though only partly developed, manufacturing area needed for such purposes in this

particular locality for the development of a large area in accordance with a comprehensive plan, and (b) because it would adversely affect property values in the vicinity." *Crowther*, 225 Md. at 385, 170 A.2d at 771.

In *Deen v. Baltimore Gas & Electric. Co.*, 240 Md. 317, 330–31, 214 A.2d 146, 153 (1965), we addressed a utility's request for a special exception to place overhead transmission lines in Baltimore County. The Zoning Commissioner granted the special exception for only part of the utility company's five-mile right-of-way. The remainder of the power transmission lines would be required to be buried. BG & E appealed to the County Board of Appeals. The Board of Appeals, after a six-day *de novo* hearing, granted the special exception in part, requiring still that some of the power transmission lines be buried. The company appealed to the Circuit Court for Baltimore County, which held that the special exception should have been granted for the entire right-of-way. In reversing the judgment of the Circuit Court, resulting in affirmance of the Board of Appeals's decision, the Court of Appeals noted that "[s]ection 502.1 implies that the effect on health, safety or general welfare must be in some sense unique or else a special exception could never be granted in such an area...." *Deen*, 240 Md. at 331, 214 A.2d at 153. *See also Brouillett v. Eudowood Shopping Plaza, Inc.*, 249 Md. 606, 608–609, 241 A.2d 404, 405 (1968) ("A further reason in support of the Board's action in denying the special exception was the appellees' failure to adduce sufficient evidence that the requested use would not 'be detrimental to the health, safety or general welfare of the locality involved.' In a hearing for a special exception where the requested use is permitted under the existing zoning classification the applicant need only show that the use is consistent with the existing classification and that it would not be adverse to the welfare of the neighborhood."); *Bd. of County Comm'rs for Prince George's County v. Luria*, 249 Md. 1, 3, 238 A.2d 108, 109 (1968) ("[T]he requisites for the granting of a special exception are a finding that the proposed use is in harmony with the general plan and a finding that the proposed use will not have an adverse effect on health and safety nor be detrimental to

adjacent properties or the general neighborhood."); *Rockville Fuel & Feed Co. v. Board of Appeals of City of Gaithersburg,* 257 Md. 183, 190–91, 262 A.2d 499, 503 (1970) ("If [the applicant] shows to the satisfaction of the Board that the proposed use would be conducted without real detriment to the neighborhood and would not actually adversely affect the public interest, [the applicant] has met his burden." (citing *Merlands* and *Oursler*)).

In *Turner v. Hammond,* 270 Md. 41, 55, 310 A.2d 543, 551 (1973), a special exception case emanating from Wicomico County, we again had occasion to describe the burden of the applicant seeking a special exception:

While the applicant has the burden of adducing testimony which will show that his use meets the prescribed standards and requirements he does not have the burden of showing affirmatively that his proposed use accords with the general welfare. If he shows to the satisfaction of the Board that the proposed use would be conducted without real detriment to the neighborhood and would not actually adversely affect the public interest, he has met his burden. The extent of any harm or disturbance to the neighboring area and uses is, of course, material but if there is no probative evidence of harm or disturbance in light of the nature of the zone involved or of factors causing disharmony to the functioning of the comprehensive plan, a denial of an application for a special exception is arbitrary, capricious and illegal.

In *Anderson v. Sawyer,* 23 Md.App. 612, 617, 329 A.2d 716, 720 (1974), Judge Rita Davidson (seven years later to become the author of *Schultz*), then writing for the Court of Special Appeals, examined an order of the Baltimore County Board of Appeals denying an application for a special exception to operate a funeral home within a residential zone. Relying on *Turner,* 270 Md. 41, 310 A.2d 543; *Cason v. Board of County Commissioners,* 261 Md. 699, 276 A.2d 661 (1971);[26] *Rockville*

---

26. *Cason,* as noted earlier, is a Prince George's County special exception case. The burden of the applicant in that case was defined with particular reference to the Prince George's County Zoning Ordinance.

*Fuel,* 257 Md. 183, 262 A.2d 499, and *Merlands Club,* 202 Md. 279, 96 A.2d 261, she described the special exception and the evaluative standard attendant to it thusly:

> The conditional use or special exception is a part of the comprehensive zoning plan sharing the presumption that, as such, it is in the interest of the general welfare, and therefore, valid. The special exception is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible absent any fact or circumstance negating the presumption. The duties given the Board are to judge whether the neighboring properties in the general neighborhood would be adversely affected and whether the use in the particular case is in harmony with the general purpose and intent of the plan.

*Anderson,* 23 Md.App. at 617, 329 A.2d at 720.

The intermediate appellate court in *Anderson* held that the Board of Appeals erroneously denied the special exception. The court noted that "in order to deny the right of the property owner to enjoy the requested special exception, the Board needed before it probative evidence that the proposed use would, in fact, create traffic congestion on Sunberry Road, and would, in fact, be detrimental otherwise to the general welfare of the locality involved. In this case there was no such probative evidence presented." *Anderson,* 23 Md.App. at 617–18, 329 A.2d at 720. In an often-quoted section, the court concluded:

> "In *Board of County Commissioners for Prince George's County v. Luria,* 249 Md. 1, 238 A.2d 108 (1968), the Court held that in a zoning case involving a special exception in Prince George's County, the applicant has the burden of proof in establishing both requirements of Section 28.2 already set forth, i.e., that (a) the proposed use is in harmony with the general plan and (b) that the proposed use will not have an adverse effect on health and safety nor be detrimental to adjacent properties or to the general neighborhood."
> 
> *Cason,* 261 Md. at 706–707, 276 A.2d at 664 (quoting *Malmar Assocs. v. Bd. of County Comm'rs for Prince George's County,* 260 Md. 292, 303, 272 A.2d 6, 11 (1971)).

There can be no doubt that an undertaking business has an inherent depressing and disturbing psychological effect which may adversely affect persons residing in the immediate neighborhood in the enjoyment of their homes and which may lessen the values thereof. Indeed, it is precisely because of such inherent deleterious effects that the action of a local legislature in prohibiting such uses in a given zone or zones will be regarded as promoting the general welfare and as constitutionally sound. But in the instant case the legislature of Baltimore County has determined that as part of its comprehensive plan funeral homes are to be allowed in residential zones notwithstanding their inherent deleterious effects. By defining a funeral home as an appropriate use by way of special exception, the legislature of Baltimore County has, in essence, declared that such uses, if they satisfy the other specific requirements of the ordinance, do promote the health, safety and general welfare of the community. As part of the comprehensive zoning plan this legislative declaration shares in a presumption of validity and correctness which the courts will honor.

The presumption that the general welfare is promoted by allowing funeral homes in a residential use district, notwithstanding their inherent depressing effects, cannot be overcome unless there are strong and substantial existing facts or circumstances showing that the particularized proposed use has detrimental effects above and beyond the inherent ones ordinarily associated with such uses. Consequently, the bald allegation that a funeral home use is inherently psychologically depressing and adversely influences adjoining property values, as well as other evidence which confirms that generally accepted conclusion, is insufficient to overcome the presumption that such a use promotes the general welfare of a local community. Because there were neither facts nor valid reasons to support the conclusion that the grant of the requested special exception would adversely affect adjoining and surrounding properties in any way other than would result from the location of any funeral

home in any residential zone, the evidence presented by the protestants was, in effect, no evidence at all.

. . . .

... The protestants have shown nothing more than that they would suffer the same degree of harm as would be suffered by any homeowner if a funeral home were permitted on land adjacent or in close proximity to their residences. If the residents of Baltimore County do not want funeral homes in residential use districts, they should prevail upon the local legislature to change the ordinance. (citations omitted)

*Anderson,* 23 Md.App. at 624–25, 329 A.2d at 724.

Less than a year after *Anderson,* in *Gowl v. Atlantic Richfield Co.,* 27 Md.App. 410, 341 A.2d 832 (1975), the Court of Special Appeals[27] purported to inject a new twist to the standards for evaluating special exceptions. *Gowl* held that, in deciding whether to grant a special exception, the zoning body should compare the adverse effects of a proposed special exception use to the adverse effects of permitted uses allowed in the zone at the site proposed for the special exception. For example, the potential for adverse effect of a proposed use on traffic congestion at a critical intersection in the neighborhood was to be compared to the effect on traffic congestion of permitted uses within the zone. The Court of Special Appeals noted that

traffic impact on an application for a special exception ought to be measured against that which could arise under permissible use, and not merely on existing traffic loads around the undeveloped premises. Where, as here, the potential volume of traffic under the requested use would appear to be no greater than that which would arise from permitted uses, we believe it arbitrary, capricious and illegal to deny the

**27.** Although she was still serving on the Court of Special Appeals at the time the opinion in *Gowl* was filed, Judge Davidson was not a member of the panel that decided *Gowl.* Her subsequent elevation to the Court of Appeals placed her in a position to play an important role in euthanizing *Gowl*

application for special exception on vehicular traffic grounds.

*Gowl,* 27 Md.App. at 417–18, 341 A.2d at 836.

### *Schultz v. Pritts*

In 1981, we decided *Schultz v. Pritts,* a case all parties to this litigation acknowledge as a bellwether case regarding special exceptions in Maryland. *See Trail v. Terrapin Run, LLC,* 403 Md. 523, 551, 943 A.2d 1192, 1208 (2008) (noting that "some have called [*Schultz*] the seminal case in the Maryland law of special exceptions"); *E. Outdoor Adver. Co. v. Mayor & City Council of Balt.,* 146 Md.App. 283, 307–08, 807 A.2d 49, 63 (2002) (describing *Schultz* as "the seminal case in Maryland concerning conditional uses or special exception uses"); *Mossburg v. Montgomery County,* 107 Md.App. 1, 8, 666 A.2d 1253, 1257 (1995) (describing *Schultz* as the "modern seminal case"); *Lawton T. Sharp Farm, Inc. v. Somerlock,* 52 Md.App. 207, 210, 447 A.2d 500, 502 (1982) (describing *Schultz* as "a landmark interpretation").

In *Schultz,* Robert and Ann Pritts petitioned for a special exception to operate a funeral home in an area zoned for single-family residential homes in Carroll County. The Carroll County Board of Zoning Appeals denied the special exception. On judicial review, the Circuit Court for Carroll County remanded the case to the Board of Zoning Appeals on due process grounds unrelated to the special exception standard.[28] The Court of Special Appeals dismissed an appeal and cross-appeal as premature. Thus, the proper evaluative standard to be applied in special exception cases was not considered until the case reached us. The Court of Appeals issued a writ of certiorari to consider all issues raised in the case.

Judge Davidson, now writing for the Court of Appeals, first cleared the way to reach the merits, holding that the Circuit

---

**28.** The Circuit Court held that, by accepting and considering evidence after the conclusion of the public hearing, the Board of Zoning Appeals violated the Prittses' right to due process of law under the Fourteenth Amendment to the United States Constitution.

Court's order remanding the case was an appealable final judgment and that the Board's actions did not violate the Prittses' due process rights. Judge Davidson then proceeded to the merits of the Prittses' other arguments.

The Prittses argued that the Board of Zoning Appeals erred because it declined to apply the *Gowl* standard in evaluating their application for the special exception. Specifically, they contended that their proposed use, a funeral home, would generate less traffic than several permitted uses allowed in the zone in which the subject property was placed. Thus, they contended, the Board of Zoning Appeals should have approved the special exception to operate a funeral home.

In finding no merit in the Prittses' argument, the Court unequivocally rejected the *Gowl* standard. The Court began its analysis by reviewing the proper standard to be applied by a zoning body in reviewing an application for a special exception.

This Court has frequently expressed the applicable standards for judicial review of the grant or denial of a special exception use. The special exception use is a part of the comprehensive zoning plan sharing the presumption that, as such, it is in the interest of the general welfare, and therefore, valid. The special exception use is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses which the legislature has determined to be permissible absent any fact or circumstance negating the presumption. The duties given the Board are to judge whether the neighboring properties in the general neighborhood would be adversely affected and whether the use in the particular case is in harmony with the general purpose and intent of the plan.

Whereas, the applicant has the burden of adducing testimony which will show that his use meets the prescribed standards and requirements, he does not have the burden of establishing affirmatively that his proposed use would be a benefit to the community. If he shows to the satisfaction of the Board that the proposed use would be conducted with-

out real detriment to the neighborhood and would not actually adversely affect the public interest, he has met his burden. The extent of any harm or disturbance to the neighboring area and uses is, of course, material. If the evidence makes the question of harm or disturbance or the question of the disruption of the harmony of the comprehensive plan of zoning fairly debatable, the matter is one for the Board to decide. But if there is no probative evidence of harm or disturbance in light of the nature of the zone involved or of factors causing disharmony to the operation of the comprehensive plan, a denial of an application for a special exception use is arbitrary, capricious, and illegal. *Turner v. Hammond,* 270 Md. 41, 54–55, 310 A.2d 543, 550–51 (1973); *Rockville Fuel & Feed Co. v. Board of Appeals of Gaithersburg,* 257 Md. 183, 187–88, 262 A.2d 499, 502 (1970); *Montgomery County v. Merlands Club, Inc.,* 202 Md. 279, 287, 96 A.2d 261, 264 (1953); *Anderson v. Sawyer,* 23 Md.App. 612, 617, 329 A.2d 716, 720 (1974). These standards dictate that if a requested special exception use is properly determined to have an adverse effect upon neighboring properties in the general area, it must be denied.

*Schultz,* 291 Md. at 11–12, 432 A.2d at 1325. The Court then surveyed prior caselaw, focusing on *Deen* and *Anderson.* The Court concluded in an often-quoted paragraph:

These cases establish that a special exception use has an adverse effect and must be denied when it is determined from the facts and circumstances that the grant of the requested special exception use would result in an adverse effect upon adjoining and surrounding properties unique and different from the adverse effect that would otherwise result from the development of such a special exception use located anywhere within the zone. Thus, these cases establish that the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any adverse effects above and beyond those inherently

associated with such a special exception use irrespective of its location within the zone.

*Schultz,* 291 Md. at 15, 432 A.2d at 1327. After summarizing the facts and analysis in *Gowl,* the Court stated that "[i]n reaching this conclusion, the trial court cited only *Deen,* 240 Md. at 330–31, 214 A.2d at 153, and the Court of Special Appeals cited no authority at all. Indeed, there is no persuasive authority that applies the *Gowl* standard or supports this conclusion." *Schultz,* 291 Md. at 19, 432 A.2d at 1329. We concluded that "the *Gowl* standard is logically inconsistent and in conflict with the standards established in *Turner* as explicated by *Deen* and *Anderson.*" *Schultz,* 291 Md. at 19, 432 A.2d 1319, 1329. Finally, the Court articulated the standard to govern special exception cases:

> We now hold that the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any adverse effects above and beyond those inherently associated with such a special exception use irrespective of its location within the zone. *Turner,* 270 Md. at 54–55, 310 A.2d at 550–51; *Deen,* 240 Md. at 330–31, 214 A.2d at 153; *Anderson,* 23 Md.App. at 617–18, 624–25, 329 A.2d at 720, 724.

*Schultz,* 291 Md. at 22–23, 432 A.2d at 1331.

### Schultz's Progeny

*Schultz* has been cited in over 100 reported Maryland appellate decisions. Both sides in this litigation have sifted through this vast body of law and highlighted particular applications of parts of the relevant language in *Schultz* that, they contend, support their respective positions. Petitioners, for example, point to *Lucas v. People's Counsel For Baltimore County,* 147 Md.App. 209, 807 A.2d 1176 (2002). In *Lucas,* a horse farm owner in Baltimore County applied for a special exception to operate an "airport" on his property so that a part owner of a thoroughbred business located at the farm

could commute to and from the property via airplane. A helicopter pad already was in operation on the property. The Board of Appeals denied the request for special exception, concluding that the proposed use constituted an "airstrip," "heliport," or "helistop," which were not permitted by special exception in the zone. As an alternative holding, the Board of Appeals relied on its interpretation of the *Schultz* standard.

In reaching that determination, the Board used the following standard: "The question is one of whether or not the adverse effects are greater at the proposed site than they would be elsewhere in the County where they may be established, i.e., the other areas within the R.C. 2 zones." The Board noted that it believed that "the appellant has the burden of establishing that the impact factor caused by the proposed use is not greater at the site than the same use elsewhere in the zone (R.C. 2 zone)."

*Lucas*, 147 Md.App. at 223, 807 A.2d at 1184.

The Board of Appeals thus found that

the impact upon the National Historic District would be greater in the Greenspring Valley than if located in other northern areas of the R.C. 2 zones. Relying considerably on the expertise of (expert witnesses) Messrs. Dillon, Solomon and Gerber, there are individual areas in the Northern part of the county that would be less impacted than at the present site. The Board concludes that it is not a matter of finding a better site for the proposed use in the R.C. 2 zone, but rather the question is one of total impact; and the Board concludes that the Appellants have not established that fact by the preponderance of the evidence to the Board's satisfaction. Acknowledging that airports and helicopter uses have inherent negative impacts, the detrimental effects upon the smaller Greenspring Valley district would clearly have a greater negative impact than if located elsewhere in the vast acreage constituting the R.C. 2 zone of Baltimore County.

*Lucas*, 147 Md.App. at 223–24, 807 A.2d at 1184–85. The Circuit Court for Baltimore County affirmed the Board's

actions with regard to the scope of the definition of an "airport" and the articulation of the *Schultz* standard.

The Court of Special Appeals affirmed the decision of the Circuit Court with regard to the definition of "airport." The intermediate appellate court acknowledged that, in light of its first holding, there remained issues that the court "need not reach for the purposes of deciding this case." *Lucas*, 147 Md.App. at 235, 807 A.2d at 1192. The court nonetheless elected to address those issues "for completeness."[29] *Id.*

The Court of Special Appeals proceeded to write approvingly of the Board of Appeals's application of *Schultz*, noting that

the question is not whether the proposed facility will have some adverse effect on the Green spring Valley area; it will because there are inherently detrimental effects associated with such facilities. The Board must determine whether the adverse effects of the special exceptions use in the particular location in which it is sought to be located *would be greater or more detrimental than they would be generally at other locations* within the R.C. 2 zone.

*Lucas*, 147 Md.App. at 238–39, 807 A.2d at 1193–94 (emphasis added). The intermediate appellate court concluded that

the Board determined that, at Helmore Farm, the adverse effects inherently associated with the proposed facility would be above and beyond the adverse effects associated with an airport elsewhere in the R.C. 2 zone. *The record clearly indicates that there are other parcels within the R.C. 2 zone where an airport would provide a lesser adverse impact than at Helmore Farm*, and the Board recognized that finding a better site was not the issue. We believe that the Board applied the appropriate standard.

---

**29.** This alone brands, at best, as considered dicta, the *Lucas* court's consideration of how *Schultz* was applied in that case by the Board and Circuit Court. We note, as we recently had occasion to do, that withholding unnecessary comment on matters not required to be addressed frequently is the better course. *Garner v. Archers Glen Partners, Inc.*, 405 Md. 43, 46, 949 A.2d 639, 641 (2008) (noting that "an appellate court should use great caution in exercising its discretion to comment gratuitously on issues beyond those necessary to be decided").

*Lucas,* 147 Md.App. at 240, 807 A.2d at 1194 (emphasis added).

Petitioners also point to *Board of County Commissioners for Cecil County v. Holbrook,* 314 Md. 210, 212, 550 A.2d 664, 665 (1988). In *Holbrook,* a landowner sought a special exception to locate a mobile home in an area zoned for agricultural use. The Cecil County Board of Appeals denied the special exception request. "We granted the Board's petition for a writ of certiorari to consider whether the intermediate appellate court's decision comported with the applicable zoning ordinance and with the standard for judicial review of a special exception set forth in *Schultz v. Pritts,* 291 Md. 1, 432 A.2d 1319 (1981)." *Holbrook,* 314 Md. at 214, 550 A.2d at 667 (1988). The Court there summarized the *Schultz* standard:

> In summary, where the facts and circumstances indicate that the particular special exception use and location proposed would cause an adverse effect upon adjoining and surrounding properties unique and different, in kind or degree, than that inherently associated with such a use regardless of its location within the zone, the application should be denied. Furthermore, if the evidence makes the issue of harm fairly debatable, the matter is one for the Board's decision, and should not be second-guessed by an appellate court.

*Holbrook,* 314 Md. at 217–18, 550 A.2d at 668. Applying that standard to the evidence before the Cecil County Board of Appeals, we concluded that

> [t]he evidence revealed that the Peters built their $147,000 house in a uniquely valuable, heavily forested, low-growth area. Moreover, photographs clearly depicted the direct and proximate view of the mobile home from the Peters's home. The Board found that this evidence "vividly indicate[d] the dehabilitating (sic) effect of the mobile home on the value of [the Peters's] property," inferring thereby that the trailer's continued presence would create "significantly greater adverse effects in this location than were it located in other areas in the zone."

*Holbrook,* 314 Md. at 219–20, 550 A.2d at 669. In reaching that conclusion, however, the Court appeared to shift the focus from the particular adverse effects on the properties neighboring the proposed use to the availability of other areas where the mobile home would have less of an adverse effect.

We find no cause to question the Board's conclusion that the mobile home, in this particular location, would impair neighboring property value to a greater extent than it would elsewhere in the zone. Countless locations exist within the zone, and indeed, within Holbrook's own property, where the presence of a mobile home would have no effect whatsoever upon adjoining property values. If, for example, trees or topography hid the mobile home from the view of the neighboring property owners, there would remain, as the Board's counsel conceded, absolutely no grounds for denying a special exception permit. The Court of Special Appeals failed to acknowledge these potential scenarios. Instead, the intermediate appellate court based its holding on the mistaken premise that, regardless of a mobile home's particular location within a zone, its negative impact on adjacent properties would remain the same.

At any rate, in light of the mobile home's high degree of visibility in this particular location, its proximity to the Peters's home, and the markedly disparate values of the Holbrook and Peters residences, we hold that the Board reasonably concluded that the permanent presence of the Holbrook mobile home would create significantly greater adverse effects in this location than were it located elsewhere in the zone.

*Holbrook,* 314 Md. at 220, 550 A.2d at 669. Petitioners argue that *Holbrook,* particularly the passage previously quoted, supports the proposition that *Schultz* compels a district-wide comparative geographic analysis of effects in each special exception. The most sympathetic statement to that effect in the Court's opinion in *Holbrook* is that "[c]ountless locations exist within the zone, and indeed, within Holbrook's own property, where the presence of a mobile home would have no effect whatsoever upon adjoining property values." *Holbrook,*

however, subsequently has been interpreted in a much different light than Petitioners argue here.

There is not necessarily a comparative analysis requirement imbedded in *Holbrook*. In a bit of rhetorical flourish, the Court actually was dismissing the intermediate appellate court's "mistaken premise that, regardless of a mobile home's particular location within a zone, its negative impact on adjacent properties would remain the same." *Holbrook*, 314 Md. at 220, 550 A.2d at 669. The Court did not compare the location of the proposed use to other locations within the zone, or require such an analysis in every case. Instead, it highlighted characteristics of the particular neighborhood that exacerbated the problems inherent to the placement of a mobile home there. *See E. Outdoor Adver. Co.*, 146 Md.App. at 309, 807 A.2d at 64 (noting that in *Holbrook* "the Court considered the deleterious impact of a mobile home on the value of adjacent properties in the 'neighborhood' "); *Sharp v. Howard County Bd. of Appeals*, 98 Md.App. 57, 83, 632 A.2d 248, 261 (1993) (discussing *Holbrook* and stating that "the Court [in *Holbrook* ] construed the relative lack of vegetative screening between the two structures and the apparently level topography as sufficient localized circumstances that rendered the adverse property value impact, arguably always inherent in this particular use, uniquely adverse").

Petitioners also point to the Court of Special Appeals's decision in *Futoryan v. Mayor & City Council of Baltimore*, 150 Md.App. 157, 819 A.2d 1074 (2003). In *Futoryan*, a landowner appealed the denial of a special exception to operate an automobile service station in the B–3–2 zone. The subject property of the special exception application was the only property within the jurisdiction zoned B–2–3. The intermediate appellate court described the problem this situation presented with the application of its view of the *Schultz* standard.

> The B–3–2 zone in this case is a tiny island, measuring a mere 64' by 122.5' and completely surrounded by residential zoning. Futoryan's property is the entire zone. The conditional use here cannot, by definition, have a greater adverse

impact at this location than it would have at some other location within the zone because there is no such thing as "some other location within the zone." There can be no comparative degree, no greater adverse impact and no lesser adverse impact, when there is nothing with which to compare the location in question.

*Futoryan,* 150 Md.App. at 178, 819 A.2d at 1086.

To solve this perceived quandary, the Court of Special Appeals divided the *Schultz* test into what the court considered to be its elements, noting that "[a]lthough in their articulation the tests are sometimes telescoped together into a single compound test, there are actually two tests inherent in the *Schultz v. Pritts* guidelines." *Futoryan,* 150 Md.App. at 178, 819 A.2d at 1086. The court continued that "[t]he more prominent and high profile of the two is that which assumes an adverse impact from the conditional use and then compares the relative severity of the adverse impact at the location in question with its likely severity at other locations within the zone." *Futoryan,* 150 Md.App. at 178–79, 819 A.2d at 1086. The court, setting the stage for application of its view, concluded its analysis of the *Schultz* test, stating that "[i]f . . . the adverse effect were weightier than the beneficial purpose [of the proposed use], the assessment of the relative severity [of the adverse effect] at different locations would then be called for." *Futoryan,* 150 Md.App. at 180, 819 A.2d at 1087. It then held that where no other properties assigned to the particular zone are available for a comparative analysis, the zoning body should compare the adverse effect of the proposed use on the neighboring properties with the "likely adverse influences [of the proposed use] at other locations in other similar zones." *Futoryan,* 150 Md.App. at 181, 819 A.2d at 1087.

Petitioners also rely on *Hayfields, Inc. v. Valleys Planning Council, Inc.,* 122 Md.App. 616, 716 A.2d 311 (1998). In *Hayfields,* a landowner sought a special exception to build a golf course in the R.C.2 zone in Baltimore County. Opponents of the golf course argued that the geological formation underlying the golf course, known as the Cockeysville Marble

formation, would increase the adverse effects of contaminant runoff. The Board of Appeals rejected their concerns, noting that there were other areas in the R.C.2 zone that were part of the Cockeysville Marble formation. Therefore, the Board of Appeals found, there was insufficient evidence to conclude that the effects of the golf course would be greater at the proposed location than other areas within the R.C.2 zone. The Court of Special Appeals held that "this finding does not comport with the test set forth in *Schultz.* Assuming that Cockeysville Marble *is* more susceptible to contamination, the mere fact that *some* of the land elsewhere in the R.C.2 zone is underlain with Cockeysville Marble does not mean that the effect would be no worse at this locality than elsewhere in the zone." *Hayfields,* 122 Md.App. at 653–54, 716 A.2d at 330. The Court of Special Appeals remanded the case to the Board of Appeals:

> If all or a substantial portion of the off-site R.C.2 land is underlain by Cockeysville Marble then it is at least possible that the Board could fairly conclude that the golf course, at its proposed site, would cause no more contamination to the aquifer than if it were located elsewhere in the R.C.2 zone. Conversely, if the Board finds that only a relatively small portion of the off-site R.C.2–zoned land is underlain with Cockeysville Marble, and if it also finds that the Cockeysville Marble formation makes the aquifer more susceptible to contamination, then it cannot be said that the golf course at the intended site would pose no greater danger to groundwater than if it were located elsewhere in the R.C.2 zone.

*Hayfields,* 122 Md.App. at 654–55, 716 A.2d at 330 (footnote omitted). Petitioners contend that *Hayfields* required a comparison of the geology and hydrology of the site of the proposed special exception to other properties within the R.C.2 zone elsewhere in Baltimore County.

Loyola's attempt to distinguish *Hayfields* is not persuasive. Loyola argues that, in the present case, there are no "truly unique" factors, such as a "Cockeysville Marble" formation, that would affect the Property. According to Loyola, all of

the potential adverse effects of the proposed Retreat Center at issue (traffic impact, agricultural impact, and environmental impact) are adverse effects inherent from the operation of any school or college use. The "Cockeysville Marble" formation in *Hayfields,* however, is not an adverse effect. The adverse effect at issue in *Hayfields* was runoff from the operation and maintenance of the golf course, containing groundwater contaminants. Contaminated runoff is a potential adverse effect inherent in the operation of a golf course. The characteristics of the locality involved, notably the "Cockeysville Marble" geology, arguably increased or amplified those adverse effects or made the locality more sensitive to those adverse effects. This is similar to the evidence adduced by Petitioners in the present case of arguably narrow roads frequently used by automobiles, trucks, and farm equipment and an assertedly environmentally-sensitive trout stream near the Property. Petitioners here contended before the Board of Appeals that those characteristics of the local neighborhood increased the debatable adverse effects attributed to the proposed Retreat Center. Thus, if the reasoning in *Hayfields* is good law, *Hayfields* squarely supports Petitioners' contention here.

Petitioners also point to *Mossburg v. Montgomery County,* 107 Md.App. 1, 8–9, 666 A.2d 1253, 1257 (1995). In *Mossburg,* the Montgomery County Board of Appeals denied a landowner's request for a special exception to operate a solid waste transfer station in "an I–2 Industrial Zone." The Board denied the request for two reasons: "traffic safety" and the "environment." With regard to the environment, the "Board found that there would be adverse impact from runoff from the subject site into a tributary that ultimately drains into Rock Creek, the Potomac River, and the Chesapeake Bay." *Mossburg,* 107 Md.App. at 13, 666 A.2d at 1259. The intermediate appellate court rejected this rationale, noting that "we know of no areas in Montgomery County where storm water runoff does not ultimately drain into the Chesapeake Bay." *Mossburg,* 107 Md.App. at 13, 666 A.2d at 1259.

But even more important, as we indicated earlier, there is absolutely no evidence, in respect to environmental con-

cerns, that the environmental impact of appellants' use at the subject site would be greater, or above and beyond, that impact elsewhere within the I–2 Zone in this industrial corridor or other I–2 Zones in that part of the regional district situated in Montgomery County. In fact, all of the evidence indicates that the impact would be the same anywhere within this I–2 industrial corridor; from the evidence, the entire area appears to be in the Southlawn Creek watershed.

*Mossburg,* 107 Md.App. at 24–25, 666 A.2d at 1265. The panel of the Court of Special Appeals described its view of the *Schultz* standard thusly:

Moreover, it is not whether a use permitted by way of a special exception will have adverse effects (adverse effects are implied in the first instance by making such uses conditional uses or special exceptions rather than permitted uses), it is whether the adverse effects in a particular location would be greater than the adverse effects ordinarily associated with a particular use that is to be considered by the agency.... The question in the case sub judice, therefore, is not whether a solid waste transfer station has adverse effects. It inherently has them. The question is also not whether the solid waste transfer station at issue here will have adverse effects at this proposed location. Certainly, it will and those adverse effects are contemplated by the statute. The proper question is whether those adverse effects are above and beyond, *i.e.,* greater here than they would generally be elsewhere within the areas of the County where they may be established, *i.e.,* the other few I–2 Industrial Zones. In other words, if it must be shown, as it must be, that the adverse effects at the particular site are greater or "above and beyond," then it must be asked, greater than what? Above and beyond what? Once an applicant presents sufficient evidence establishing that his proposed use meets the requirements of the statute, even including that it has attached to it some inherent adverse impact, an otherwise silent record does not establish that

impact, however severe at a given location, is greater at that location than elsewhere.

*Mossburg,* 107 Md.App. at 8–9, 666 A.2d at 1257. Petitioners contend that the environmental analysis discussed in *Mossburg* invites the type of comparative multiple site analysis demanded here.

Loyola, on the other hand, argues that the holdings of *Lucas, Holbrook, Futoryan, Hayfields,* and *Mossburg,* to the extent that they endorse a comparative, multiple site analysis in special exception cases, are outliers. Loyola notes correctly that the majority of cases discussing *Schultz* do not address, much less imply, such a requirement. *See, e.g., Singley v. County Comm'rs of Frederick County,* 178 Md.App. 658, 679–80, 943 A.2d 636, 648–49 (2008); *Handley v. Ocean Downs, LLC,* 151 Md.App. 615, 646, 827 A.2d 961, 979 (2003); *Evans v. Shore Commc'ns, Inc.,* 112 Md.App. 284, 303–05, 685 A.2d 454, 463–64 (1996), *Moseman v. County Council of Prince George's County,* 99 Md.App. 258, 266, 636 A.2d 499, 503 (1994); *Sharp v. Howard County Bd. of Appeals,* 98 Md.App. 57, 86–89, 632 A.2d 248, 263–64 (1993); *People's Counsel for Baltimore County v. Mangione,* 85 Md.App. 738, 751–52, 584 A.2d 1318, 1324–25 (1991)[30]; *Gotach Ctr. for Health v. Bd. of County*

---

**30.** People's Counsel points out that, before the Board of Appeals in *People's Counsel for Baltimore County v. Mangione,* 85 Md.App. 738, 751–52, 584 A.2d 1318, 1324–25 (1991), it presented comparative multiple site evidence in a successful opposition to a request for a special exception to build and operate a nursing home. The reported opinion of the Court of Special Appeals omitted any mention of this evidence. The Court of Special Appeals, in reinstating the Board's decision, relied only on the evidence presented regarding the effects on the neighborhood surrounding the proposed location.

Before the Board were various facts and circumstances which, we believe, satisfy the *Schultz* standard of particular adverse impact. The Board, under the *Schultz* standard, reviewed the evidence for the required particular adverse impact. There was testimony that the proposed convalescent home would sit on the prominent or dominant terrain above the neighborhood, which would block out light from the west; and with prevailing breezes from the west, would generate odors from the central kitchen as well as from the dumpster. There was testimony concerning the effects of the development along the York Road corridor and the erosion created by the development and

*Comm'rs of Frederick County,* 60 Md.App. 477, 486, 483 A.2d 786, 791 (1984).

## Analysis

█ Evaluation of a special exception application is not an equation to be balanced with formulaic precision. *See Sharp,* 98 Md.App. at 73, 632 A.2d at 256 (rejecting "appellants' interpretation of the holding of *Schultz* as if it were the atomic chart of elements from which a formula for divining inherent and peculiar adverse effects could be derived"). That lack of a precise rubric is reflected in the standard of judicial review applied to zoning decisions. Courts are to defer to the conclusions of the zoning body where the "evidence makes the question of harm or disturbance or the question of the disruption of the harmony of the comprehensive plan of zoning *fairly debatable." Schultz,* 291 Md. at 26, 432 A.2d at 1333 (emphasis added); *see also Alviani v. Dixon,* 365 Md. 95, 107–08, 775 A.2d 1234, 1241 (2001); *Holbrook,* 314 Md. at 217–18, 550 A.2d at 668.

---

storm water runoff. There was testimony concerning the effects of the intrusion of the project into the residential neighborhood presently existing around that location. There was testimony about small arterial streets whose only access to York Road from the community was by way of Green Ridge Road, and that the narrow, winding nature of those streets, with the increased traffic, would jeopardize the safety of the children playing in the streets. Furthermore, there was testimony concerning the overflow of contaminated medical waste and storm water management.

The Board, as finder of fact, said it was "obligated to judge the credibility of each witness and apply each Board member's own knowledge, developed through experience and training, to the evidence presented." In sum, the Board concluded that the proposed project would "overwhelm and dominate the surrounding landscape," and that it would represent "the deepest intrusion into the residential community of Dulaney Valley." The Board found that the project would "clearly exacerbate an already worsening storm water runoff situation" within that community. Further, the Board was unconvinced that the "traffic generated by the home's employees and visitors would not overtax an interior community road system designed to accommodate residential traffic." The Board then held that the appellees failed to meet its burden as provided under B.C.Z.R. Section 502.1.

*Mangione,* 85 Md.App. at 751–52, 584 A.2d at 1324–25.

■ It is clear in examining the plain language of *Schultz*, and the cases upon which *Schultz* relies, that the *Schultz* analytical overlay for applications for individual special exceptions is focused entirely on the neighborhood involved in each case. The requirement for such an analysis focused on the local neighborhood is apparent in the often-quoted *Schultz* holding:

We now hold that the appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any adverse effects above and beyond those inherently associated with such a special exception use irrespective of its location within the zone.

*Schultz*, 291 Md. at 22–23, 432 A.2d at 1331.

The *Schultz* standard requires an analysis of the effects of a proposed use "irrespective of its location within the zone." "Irrespective of" is defined by WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1993) as "regardless of." The same dictionary defines "regardless of" as "without taking into account." Petitioners' argument urges the opposite result. Petitioners contend that *Schultz* requires an applicant for a special exception to compare, and concomitantly the zoning body to consider, the adverse effects of the proposed use at the proposed location to, at least, a reasonable selection or representative sampling of other sites within the same zone throughout the district or jurisdiction, *taking into account* the particular characteristics of the areas surrounding those other test sites. The *Schultz* standard requires no such evidentiary burden be shouldered by an applicant nor analysis undertaken by the zoning decision-maker.

*Schultz* speaks pointedly to an individual case analysis focused on the particular locality involved around the proposed site. *See Schultz*, 291 Md. at 15, 432 A.2d at 1327 ("These cases establish that a special exception use has an adverse effect and must be denied when it is determined from the facts

and circumstances that the grant of the requested special exception use would result in *an adverse effect upon adjoining and surrounding properties* unique and different from the adverse effect that would otherwise result from the development of such a special exception use located anywhere within the zone." (emphasis added)); *Schultz*, 291 Md. at 11, 432 A.2d at 1324 ("The duties given the Board are to judge whether *the neighboring properties in the general neighborhood would be adversely affected* and whether the use in the particular case is in harmony with the general purpose and intent of the plan." (emphasis added)); *id.* ("If [the applicant] shows to the satisfaction of the Board that the proposed use would be conducted *without real detriment to the neighborhood* and would not actually adversely affect the public interest, he has met his burden. The extent of any harm or disturbance *to the neighboring area* and uses is, of course, material." (emphasis added)); *Schultz*, 291 Md. at 12, 432 A.2d at 1325 ("These standards dictate that if a requested special exception use is properly determined to have an adverse effect *upon neighboring properties in the general area*, it must be denied." (emphasis added)).

Furthermore, the cases on which *Schultz* relies also focus on an analysis of the locality involved in the specific proposal. *Schultz* largely relies on five cases: *Turner*, 270 Md. 41, 310 A.2d 543; *Rockville Fuel*, 257 Md. 183, 262 A.2d 499; *Deen*, 240 Md. 317, 214 A.2d 146; *Merlands Club*, 202 Md. 279, 96 A.2d 261; and *Anderson*, 23 Md.App. 612, 329 A.2d 716. Each case contains language that directs that the special exception impact analysis focus on the properties surrounding the location of the proposed use, in whatever zone they be placed. *See Turner*, 270 Md. at 55, 310 A.2d at 551 ("If [the special exception applicant] shows to the satisfaction of the Board that the proposed use would be conducted *without real detriment to the neighborhood* and would not actually adversely affect the public interest, he has met his burden. The extent of any harm or disturbance *to the neighboring area* and uses is, of course, material but if there is no probative evidence of harm or disturbance in light of the nature of the zone involved

or of factors causing disharmony to the functioning of the comprehensive plan, a denial of an application for a special exception is arbitrary, capricious and illegal." (emphasis added)); *Rockville Fuel,* 257 Md. at 190–91, 262 A.2d at 503 ("If [the applicant] shows to the satisfaction of the Board that the proposed use would be conducted *without real detriment to the neighborhood* and would not actually adversely affect the public interest, [the applicant] has met his burden." (emphasis added)); *Deen,* 240 Md. at 331, 214 A.2d at 153 ("Section 502.1 states that a special exception may be granted if the use requested will not 'be detrimental to the health, safety, or general welfare *of the locality* involved.' "[31] (emphasis added)); *Merlands Club,* 202 Md. at 287–88, 96 A.2d at 264 (1953) ("The duties given the Board are to judge whether *the neighboring properties and the general neighborhood* would be adversely affected, and whether the use, in the particular case, is in harmony with the general purpose and intent of the zoning plan."(emphasis added)); *id.* ("[W]here a specific use is permitted by the legislative body in a given area if the general zoning plan is conformed to and there is *no adverse effect on the neighborhood,* the application can be granted...." (emphasis added)).

The use of the descriptive term "inherent" in *Schultz* comes directly from Judge Davidson's opinion for the Court of Special Appeals in *Anderson.*[32] Thus, *Anderson* is particularly important to a proper understanding of what Judge Davidson and the Court meant in *Schultz* in defining what adverse effects are "inherent" in a proposed use. As discussed above, *Anderson* involved a request for a special exception to operate a funeral home in a residential area. The Court of Special

---

**31.** BCZR § 502.1 still reads, in pertinent part, "Before any special exception may be granted, it must appear that the use for which the special exception is requested will not ... [b]e detrimental to the health, safety or general welfare of the locality involved...."

**32.** The other cases upon which *Schultz* relies do not employ the term "inherent" in their explication of what factors bear upon a proper analysis of the legislative factors provided in a particular zoning ordinance for a special exception.

Appeals in *Anderson* discussed at length two particular adverse effects inherent in the operation of a funeral home. First, the Court rejected the argument that the special exception request should be denied because of the depressing psychological effects deemed inherent to the operation of a funeral home. There was no probative evidence offered that the depressing effect of the funeral home would be any greater at the proposed location than in any other residential area in the same zone where it was allowed by special exception. Second, the Court of Special Appeals discussed the effect of traffic, also inherent to operation of a funeral home. The intermediate appellate court's discussion of the increase in traffic that may be caused by the funeral home focused only on the potential for an adverse effect at the particular location. No comparative, multiple site impact analysis was performed or called for to determine what adverse effects were in excess of those "inherent" in a funeral home establishment. Thus, the *Schultz* standard, as presaged in *Anderson*, requires that the adverse effect "inherent" in a proposed use be determined without recourse to a comparative geographic analysis. Any language to the contrary in *Holbrook, Lucas, Futoryan, Hayfields*, and *Mossburg* is disapproved.

But what sense is to be made of *Schultz's* language referring to consideration of whether "the particular use proposed at the particular location proposed would have any adverse effects above and beyond those inherently associated with such a special exception use irrespective of its location within the zone"? Is it to be declared surplusage? Is it to be stricken or disapproved because the 2008 composition of this Court simply has had a change of mind twenty-seven years later? The answer is "no." The language retains vitality and sense as long as the *raison d'etre* for its inclusion in *Schultz* is understood.

As noted previously and frequently, a
special exception is a valid zoning mechanism that delegates to an administrative board a limited authority to permit enumerated uses which the legislative body has determined can, *prima facie*, properly be allowed in a specified use

district, absent any fact or circumstance in a particular case which would change this presumptive finding.

*Merlands Club,* 202 Md. at 287, 96 A.2d at 264; *see also Creswell v. Balt. Aviation Serv. Inc.,* 257 Md. 712, 719, 264 A.2d 838, 842 (1970); *Rockville Fuel,* 257 Md. at 188, 262 A.2d at 502.

The local legislature, when it determines to adopt or amend the text of a zoning ordinance with regard to designating various uses as allowed only by special exception in various zones, considers in a generic sense that certain adverse effects, at least in type, potentially associated with (inherent to, if you will) these uses are likely to occur wherever in the particular zone they may be located. In that sense, the local legislature puts on its "Sorting Hat" [33] and separates permitted uses, special exceptions, and all other uses. That is why the uses are designated special exception uses, not permitted uses. The inherent effects notwithstanding, the legislative determination necessarily is that the uses conceptually are compatible in the particular zone with otherwise permitted uses and with surrounding zones and uses already in place, provided that, at a given location, adduced evidence does not convince the body to whom the power to grant or deny individual applications is given that actual incompatibility would occur. With this understanding of the legislative process (the "presumptive finding") in mind, the otherwise problematic language in *Schultz* makes perfect sense. The language is a backwards-looking reference to the legislative "presumptive finding" in the first instance made when the particular use was made a special exception use in the zoning ordinance. It is not a part of the required analysis to be made in the review

---

**33.** In the HARRY POTTER series of books, the "Sorting Hat" is a magical artifact that is used to determine in which house (Gryffindor, Hufflepuff, Ravenclaw or Slytherin) first-year students at Hogwarts School of Wizardry and Witchcraft are to be assigned. After being placed on a student's head, the Sorting Hat measures the inherent qualities of the student and assigns him or her to the appropriate house. J.K. ROWLING, HARRY POTTER AND THE SORCERER'S STONE (1998).

process for each special exception application. It is a point of reference explication only.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; PETITIONERS TO DIVIDE THE COSTS EQUALLY.**

MURPHY, J., concurs and files opinion.

MURPHY, Judge, concurring.

I agree "that the *Schultz* analytical overlay for applications for individual special exceptions is focused entirely on the neighborhood involved in each case," and that "the *Schultz* standard ... requires that the adverse effect 'inherent' in a proposed use be determined without recourse to a comparative geographic analysis." I write separately, however, to emphasize that (1) the "neighborhood involved" in a particular case may well have a different zoning classification than the property that is the subject of the application, and (2) our disapproval of "language to the contrary in *Holbrook, Lucas, Futoryan, Hayfields,* and *Mossburg* " should not be misinterpreted as a disapproval of the "bottom line" decisions made in each of those cases.

In *Harris v. State,* 81 Md.App. 247, 567 A.2d 476 (1989), *rev'd on other grounds,* 324 Md. 490, 597 A.2d 956 (1991), Judge Moylan stated:

> The Maryland decisional law on the subject that some call "other crimes evidence" ... gives no occasion for complaint. The language and the framework of analysis used by both appellate courts of this state to describe and to explain that law, however, leave much to be desired in terms of current usage. Our decisions are better than our opinions.

*Id.* at 254, 567 A.2d at 479. As the majority opinion makes clear, the same may be said about appellate opinions on the subject of special exceptions.

In *Holbrook,* this Court correctly upheld the conclusion of the Cecil County Board of Appeals that the applicant should not be granted a special exception to place a mobile home in a

particular location on his property because the presence of the mobile home at that location would have an adverse effect upon adjoining property values.

In *Lucas,* the Court of Special Appeals correctly upheld the conclusion of the Baltimore County Board of Appeals that the applicant should not be granted a special exception to operate an airport on his property because the operation of an airport would have a negative impact on the Greenspring Valley properties located nearby.

In *Futoryan,* the Court of Special Appeals correctly upheld the conclusion of the Baltimore City Board of Zoning Appeals that the applicant should not be granted a "conditional use" permit to operate an auto repair shop on property zoned as a B–3–2 Business District, surrounded on all sides by residential zoning, because the operation of an auto repair shop would be (in the words of the Board) "a detriment to the general welfare of the adjoining residential community."

The decisions in *Holbrook, Lucas* and *Futoryan* are consistent with the majority opinion in the case at bar, as well as with this Court's holding in *Brouillett v. Eudowood Shopping Plaza Inc., supra.* In that case, (1) the Baltimore County Board of Appeals denied a petition requesting a special exception for the operation of a self-service carwash on the parking lot of the Eudowood Shopping Plaza, which was zoned Business–Local, (2) the Circuit Court for Baltimore County reversed the Board, and (3) this Court reversed the Circuit Court, noting that "the proposed use would be clearly visible to a residential area [containing dwellings zoned as group houses] with home values [in 1967 and 1968] of $45,000.00 and more." 249 Md. at 609, 241 A.2d at 405.

In *Mossburg,* the Court of Special Appeals correctly held that a special exception to operate a solid waste transfer station should not have been denied by the Montgomery County Board of Appeals on "speculation" that, at the particular location of the transfer station, there would be adverse impacts from (1) runoff into a tributary that ultimately drains

into the Chesapeake Bay, and (2) a serious traffic hazard created by truck traffic.

As to *Hayfields*, which involved a special exception to operate a golf course, the Court of Special Appeals remanded with directions that the Baltimore County Board of Appeals resolve certain questions relating to whether the particular location of the proposed course would adversely affect ground water in wells on or near the course. I am persuaded that the decision to remand was (1) correct, and (2) not inconsistent with the majority's analysis of *Schultz*.

It may be helpful to restate the rules of engagement in special exception litigation, and review how those rules were applied in the case at bar. Although it is of no real consequence whether we say that an applicant "is entitled to a special exception, *provided that*," or that an applicant "is *not* entitled to a special exception, *unless*," the applicant for a special exception bears both the burden of production and the burden of persuasion on the issue of whether the special exception should be granted. If the zoning authority is presented with evidence that generates a genuine question of fact as to whether the grant of a special exception would violate the applicable legislation and/or the requirements of *Schultz*, the applicant must persuade the zoning authority by a preponderance of the evidence that the special exception will conform to all applicable requirements.

In the case at bar, the petitioners presented evidence that generated a genuine question of fact as to whether (1) an adverse "thermal" impact would result from stormwater ponds draining into a trout stream near the property, and (2) there would be an adverse "traffic impact" on the main public road used by persons traveling to and from the proposed Retreat Center. Respondent was not entitled to a special exception unless it persuaded the Board of Appeals that neither of those adverse impacts would result if the special exception was granted. The Board, applying the correct burden of persuasion, found in favor of respondent on both of these issues.

Under the applicable standard of review, this Court must affirm the Board's decision.